### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |
|---|---|
| JOHN F. PORTILLO et al., individually and on behalf of all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>NATIONAL FREIGHT, INC. and NFI INTERACTIVE LOGISTICS, INC.,<br><br>　　　　　　　Defendants. | **Hon. Joseph H. Rodriguez**<br><br>Civil No. 15-7908 (JHR/KMW)<br><br><br>**<u>OPINION</u>** |

This case is before the Court on Plaintiffs' Motion for Class Certification, filed on September 3, 2019. [Docket No. 129.] For the reasons expressed herein, the Court will grant Plaintiffs' Motion.

### I.    <u>Background</u>

Defendants NFI Interactive Logistics, Inc. and National Freight, Inc. (collectively, "NFI") compose "a leading provider of transportation, logistics and distribution services" to various clients including, most relevant to this case, Trader Joe's Markets. [Docket No. 102, ¶ 19.] NFI transports goods between Trader Joe's warehouses and stores up and down the Eastern Seaboard. [<u>Id.</u>] To fulfill its obligations to Trader Joe's, NFI uses both its own employees and independent contractors as delivery drivers. [<u>Id.</u>] Named Plaintiffs in this suit — John F. Portillo, Rafael Suarez, Martin Duran, German Bencosme, Edin Vargas, Luis A. Hernandez, Josue Paz, and Alvaro Castaneda (collectively, "Named Plaintiffs") — worked for NFI as delivery drivers during the

relevant time period (i.e., between June 22, 2019, and the present). [Id.] Each of them signed an agreement (generally referred to as an "Independent Contractor Agreement" or "ICA") with NFI, discussed in more detail below, that classified them as independent contractors rather than employees. [Docket No. 129-1, at 4.] Plaintiffs believe that "NFI entered into at least 135 [such] agreements with who performed deliveries full-time to Trader Joe's stores on the East Coast on NFI's behalf." [Id.] They allege, on behalf of themselves and others similarly situated, that they were wrongly classified as independent contractors and "that as a result of that misclassification, NFI illegally deducted amounts from their compensation in violation of the New Jersey Wage Payment Law" ("NJWPL"). [Id. at 1.]

Defendants used four different ICAs during the relevant time period. [Docket No. 148, at 4 n.3.] In 2009, NFI used an agreement called the "Lessor and Lessee Operating Agreement" (the "2009 LLOA"). [Docket No. 143-3, ¶ 8.] Beginning at some point in 2010, NFI started using an agreement called the "Independent Contractor Operating Agreement" (the "2010 ICOA"). [Id., ¶ 9.] In 2017 and 2019, NFI implemented new versions of the Independent Contractor Operating Agreement (the "2017 ICOA" and "2019 ICOA," respectively). [Id. ¶¶ 10-11.] Importantly, the 2009 LLOA contains a New Jersey choice of law provision and no forum selection clause (the "2009 LLOA Provision"); the 2010 and 2017 Agreements contain a New Jersey choice of law provision and a New Jersey forum selection clause (the "2010 ICOA Provision" and "2017 ICOA Provision," respectively); and the 2019 Agreement contains a Texas choice of law provision and a Texas forum selection clause (the "2019 ICOA Provision"). [Docket No. 142, at 5-6.] According to Defendants, as of October 18, 2019, five drivers had signed the 2019 Agreement. [Id. at 6.]

Other than the choice-of-law clauses, the contents of the various ICAs are materially the same. They required various things from the drivers, including background checks, drug and alcohol testing, Defendants' exclusive use of the drivers' trucks, utilization of a specific GPS system, acquisition of various forms of insurance, regular inspections by Defendants, record maintenance, log sheets, toll receipts, and immediate reporting of all accidents, among various other terms. [See Docket No. 129-1, at 4-6.] Defendants also utilized various workplace rules and procedures, including handbooks, codes of conduct, and other written policies that dictated the drivers' activities. [See id. at 6.] The drivers had to put NFI's logo on their trucks and were prohibited from putting another company's logo on them. [Docket No. 129-1, at 7.] They were restricted in their ability to work for other companies, both practically (given the amount of hours they worked) and contractually (Defendants had to give written consent). [Id.]

In practice, the drivers would report at least once per day to a Trader Joe's warehouse in either Nazareth or Hatfield, Pennsylvania, locations where Defendants have offices and on-site staff. [Id. at 8.] Their deliveries and routes were pre-determined by Defendants, including the times that they had to be made. [Id. at 8-9.] Defendants were able to monitor drivers' progress via the GPS system mentioned above. [Id. at 9.] Failure to follow the procedures, rules, policies, and schedules set out by Defendants could result in Defendants' employees disciplining the drivers. [Id. at 10.]

Finally, Defendants had the authority to make various deductions from the drivers' weekly paychecks. [Id. at 11.] Deductions included costs for the GPS device, damages to goods or property, fuel, insurance, and other things. [Id. at 11-12.] The crux of Plaintiffs' case is their allegation that these deductions were taken illegally by

Defendants. [Id. at 1.] This relies on a finding that Plaintiffs were in fact employees, and not independent contractors, under the NJWPL, which would make such deductions illegal. [Id.]

In order to rectify their alleged damages, Plaintiffs filed this suit in the Superior Court of New Jersey Law Division in Camden County on June 19, 2015. [Docket No. 1-3.] On November 5, 2015, Defendants removed the case to this Court. [Docket No. 1.] After nearly three years of litigation — including discovery issues and denied motions to remand, to dismiss, and for summary judgment — Plaintiffs filed the operative Amended Complaint on August 13, 2018. [Docket No. 102.] The parties then unsuccessfully attempted to resolve the case via mediation between November 30, 2018, and April 15, 2019. [See Docket Nos. 104-111.] After further discovery issues, Plaintiffs filed their Motion for Class Certification on September 3, 2019. [Docket No. 129.] Defendants filed their response in opposition on October 18, 2019. [Docket No. 142.] Plaintiffs timely filed their response on November 1, 2019. [Docket No. 148.] Defendants were permitted to file a sur-reply brief on June 30, 2020. [Docket No. 168.]

## II.   **Jurisdiction**

The Court exercises subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1453 ("CAFA"). As required by CAFA, the putative class in this case consists of at least 100 proposed class members, the citizenship of at least one of which being diverse from that of at least one of the Defendants. [Docket No. 102, ¶ 16.] The CAFA amount-in-controversy requirement is also met, as that figure exceeds $5,000,000 here. [Id.]

### III. __Plaintiffs' Motion for Class Certification__

The Court will next address Plaintiffs' Motion for Class Certification. [Docket No. 129.] For the reasons expressed below, the Motion will be granted.

#### A. **Choice of Law**

The first argument that Defendants make in their opposition to Plaintiffs' Motion for Class Certification revolves around what law should apply in this case. [See Docket No. 142, at 11-14.] In their initial brief, Plaintiffs refer exclusively to New Jersey law, which they argue applies because of an earlier decision made by the late Honorable Jerome B. Simandle. [See Docket No. 129, at 4 n.4.] Defendants disagree with that interpretation of that Opinion. [Docket No. 142, at 11-14.] The Court will therefore begin its discussion with a recounting of the Opinion in question.

It is crucial to note that at the time of the Court's previous Opinion, NFI had not yet begun to use the 2019 ICOA (with the Texas choice-of-law clause). However, the remaining facts upon which the Court relied are equally present today.

The Court utilized New Jersey's "most significant relationship test," which follows Sections 6, 145, and 221 of the Restatement (Second) of Conflict of Laws. [See id. at 26-27, 31-32.] It concluded that "New Jersey has the most significant relationship to the parties, the working relationships, and the claims at issue in this case." [Id. at 38-39.] The Court noted its mindfulness of four factors in particular. First, the Court held that "Plaintiffs and Defendants reasonably expected New Jersey law to apply to the bulk of their disputes and contracted for that outcome." [Id. at 39.] After all, "Defendants are the more sophisticated party and the drafters of the contract; they elected to be bound (with regard to contract claims) by New Jersey law and to bind the drivers to New Jersey law with regard to such claims, and Plaintiffs also seek to apply New Jersey law." [Id. at

39.] Since "the reasonable expectations of the parties to a contract is one of the important factors in a choice-of-law analysis under the Restatement," the Court found that this factor cut in favor of applying New Jersey law. [Id.]

Second, the Court noted that "the nature of Plaintiffs' work was highly mobile and not based in any other state more significantly so as to grant that state the most significant interest under the Restatement's analysis." [Id.] Even though none of Named Plaintiffs are New Jersey citizens, [see id. at 5], and their home states "have an interest in the proper payment of wages to their citizens, it appears to be without question that Plaintiffs knowingly took on a business opportunity that was inherently of an interstate nature," [id. at 39-40].

Third, the Court stated that,

> while the center of the relationship between the parties in physical terms appears to be in Pennsylvania at the warehouse interface, as that is where the Plaintiffs interacted with Defendants on the most regular basis, that does not lead to the conclusion that Pennsylvania has the most significant interest in light of all other factors. This would seem to bind Defendants to abiding by the wage laws of any state in which it has, effectively, a satellite office that serves as a home-base to drivers, when Defendants' operations are primarily in New Jersey and Plaintiffs and Defendants reasonably sought to apply New Jersey law to their contractual claims, as discussed above.

[Id. at 40.]

And fourth, "the Court note[d] that Plaintiffs did perform a significant portion of their work in New Jersey." [Id.] It distinguished this case from one in which "Plaintiffs seek the protection of New Jersey state wage and employment laws for the people who avowedly never worked in New Jersey." [Id.]

In sum, those four factors persuaded the Court to rule that "New Jersey has the most significant interest in these particular circumstances," meaning that "New Jersey law applies to Plaintiffs' claims." [Id. at 40-41.]

Defendants argue that the previous Opinion only "applies to the Named Plaintiffs' claims," and that Judge Simandle "did not rule, and could not have ruled, on the putative class's claims, as those claims were not before him." [Docket No. 142, at 11.] Defendants then try to argue that the factual differences between Named Plaintiffs and putative class members are sufficient to conclude that the choice of law ruling could not be the same for all putative class members. [Id. at 12.] Specifically, Defendants argue that five facts could distinguish putative class members from Named Plaintiffs sufficiently enough to render the Court's prior Opinion inapplicable to putative class members. They are: (1) "where putative class members reside;" (2) "the states in which they incorporated their companies;" (3) whether they signed the 2009 LLOA, which has no venue selection clause; (4) "the states in which they make or made deliveries;" and (5) whether they signed the 2019 ICOA, which has Texas — not New Jersey — choice of law and venue selection provisions. [Id.]

With respect to Defendants' first and second points, none of Named Plaintiffs resided in New Jersey at the time of Judge Simandle's ruling, nor had any incorporated their trucking companies in New Jersey. [See Docket No. 94, at 5.] Of the eight named Plaintiffs, five were Rhode Island residents and three were Pennsylvania residents.[1] [Id.] Meanwhile, three Named Plaintiffs had their own trucking companies and each of them was incorporated in Rhode Island. [Id.] Yet the Court found that none of the states of

---

[1] One of the three Pennsylvania residents also lived in Rhode Island for a portion of the relevant time period. [Docket No. 94, at 5.]

residence or of incorporation had a more significant interest than New Jersey due to the other factors involved. [Id. at 38-39.] Therefore, the questions of where the putative class members reside or where their companies are incorporated would not change the outcome of this issue: either they are not residents of or incorporated in New Jersey, in which case they are just like the eight Named Plaintiffs whose claims are governed by New Jersey law, or they *are* residents of or incorporated in New Jersey, in which case the Court's choice of law analysis would point even more clearly to New Jersey law applying. Therefore, this argument by Defendants is unavailing.

Similarly, Defendants' third argument, that the lack of a venue selection clause in the 2009 LLOA matters, is meritless. After all, five of the eight Named Plaintiffs had signed the 2009 LLOA, and the Court still found that New Jersey law should apply. [Id. at 4-5.] Obviously, then, the fact that some putative class members also signed the 2009 LLOA does nothing to undermine the ruling that New Jersey law should apply.

Defendants' fourth factual argument revolves around whether putative class members made deliveries in New Jersey. In the previous Opinion, the Court held that the fact that Named Plaintiffs did perform some work in New Jersey cut in favor of New Jersey law applying. [Docket No. 94, at 40.] The Court came to this conclusion in spite of the fact that Named Plaintiffs "all reported to work for Defendants in Pennsylvania and had their primary face-to-face interactions with Defendants through Defendants' Pennsylvania place of business and Pennsylvania-based employees." [Id. at 30.] It even held that "the physical relationship between the parties was centered in Pennsylvania," where Named Plaintiffs began and finished each of their deliveries, among other activities. [Id. at 32.] Nevertheless, the Court found that Named Plaintiffs performed "a significant portion of their work in New Jersey." [Id. at 40.] The Court noted that

8

Named Plaintiffs "carried out deliveries in . . . New Jersey" and were sometimes required to communicate with NFI employees in New Jersey. [See id. at 7, 29.]

Defendants allege that its "data shows 28 Contractors who performed no work in New Jersey." [Docket No. 142, at 13.] Plaintiffs counter that "[a] closer review of NFI's data reveals that 7 of those driers are not class members in any event because they were not full-time drivers for NFI, and many others almost certainly drove in New Jersey to perform their deliveries." [Docket No. 148, at 6.] Even accepting Defendants' assertions, this Court finds that, all else being equal, a lack of deliveries having been made in New Jersey does not so distinguish the circumstances surrounding a putative class member from those surrounding Named Plaintiffs so as to alter Judge Simandle's prior analysis. The much more significant ties to New Jersey — most importantly the choice-of-law clause in combination with Plaintiffs' willful decision to engage with a New Jersey business and be bound by New Jersey law, but also the still-present fact that drivers would sometimes have to communicate with Defendants' employees in New Jersey, — were much more significant in the Court's decision. Although the lack of deliveries to New Jersey would render this decision an even closer one than it was before, that fact alone would not tip the scales in favor of another state. Therefore, this Court holds that, based on its prior decision, the mere lack of deliveries to New Jersey would not mean that a state other than New Jersey has "the most significant interest in these particular circumstances."

That brings the Court to Defendants' fifth and final choice-of-law argument: the 2019 ICOA, which has Texas choice of law provisions and which at least five putative class members have signed. As noted above, a large part of the Court's prior decision stemmed from the dual nature of the parties' relationships: "the contractual relationship

is centered in New Jersey and the physical interface of work performance is in Pennsylvania." [Docket No. 94, at 30.] The Court also listed as the principal reason for deciding the "close question" that New Jersey law applied:

> Defendants are the more sophisticated party and the drafters of the contract; they elected to be bound (with regard to contract claims) by New Jersey law and to bind the drivers to New Jersey law with regard to such claims, and Plaintiffs also seek to apply New Jersey law. This is the unusual case where Plaintiffs seek to bind the drafters of the contract to the choice-of-aw stated therein. While the Court, as discussed above, does not find that the scope of that provision encompasses the Plaintiffs' claims literally and directly, the Court does note that giving effect to the reasonable expectations of the parties to a contract is one of the important factors in a choice-of-law analysis under the Restatement. Here, it appears fair to presume that Plaintiffs and Defendants reasonably expected New Jersey law to apply to the bulk of their disputes and contracted for that outcome.

[Id. at 39.]

In short, the Court's previous decision relied heavily on the fact that the 2009 LLOA, the 2010 ICOA, and the 2017 ICOA all had New Jersey choice-of-law clauses. The 2019 ICOA, conversely, has a Texas choice-of-law clause. This fact drastically changes the Court's previous analysis. This Court holds that the lack of a New Jersey choice-of-law clause in the 2019 ICOA would change the outcome of the Court's previous decision. As noted above, the predominant piece of evidence that affirmatively pointed to the "close" ruling that New Jersey had the most significant relationship was the New Jersey choice-of-law clause. [See id.] Without that consideration, the relevant Restatement factors (that is, the Section 6, 145, and 221 factors) would no longer point to New Jersey as the state with the most significant relationship. Instead, the parties' physical relationship, which predominantly existed in Pennsylvania, would be the most fundamental factor in determining which state "has the most significant relationship to the parties, the working relationships, and the claims at issue." [See id. at 38-39.]

Plaintiffs themselves seem to concede this point. [See Docket No. 148, at 4-5.] Their only arguments with respect to the five individuals who signed the 2019 ICOA are (1) "they may not even be in the class" due to the other class requirements; (2) they might have worked under one or more of the previous contracts that did have a New Jersey choice-of-law clause, in which case they are still eligible class members; and (3) in any event, Defendants only identify five such people, meaning that there are still at least 130 others who would qualify as class members. [See id.] They make no argument that New Jersey law should apply to those five individuals and instead argue that Pennsylvania law should apply either to the entire class or to a subclass. [See id. at 6 n.4.] Neither of these options are viable here. First of all, the Court cannot apply Pennsylvania law to the entire class when, as shown above, the Court already ruled that New Jersey law applied to the majority of the class. Second of all, a subclass requires numerosity, just like any other class. Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 595 (3d Cir. 2012). As will be made clearer below, a proposed class of five members would not satisfy the numerosity requirement. Because the choice-of-law question is not contested with respect to the drivers who signed the 2019 ICOA, the Court will refrain from giving an in-depth analysis of what state has the most significant relationship to the circumstances surrounding the drivers who signed the 2019 ICOA. For the purposes of this Motion, it suffices to say that New Jersey law would not apply to those drivers.

In conclusion, with respect to Defendants' arguments that the Court's previous Opinion about choice of law does not apply to anybody beyond Named Plaintiffs, the Court now holds that its previous Opinion does apply to the putative class members, except for those who only signed the 2019 ICOA.

### B.    Rule 23 Requirements

The Court will next discuss the requirements of Federal Rule of Civil Procedure 23, which governs class certification. Per that rule, a putative class must satisfy each of Rule 23(a)'s four requirements as well as one of Rule 23(b)'s three requirements. See FED. R. CIV. P. 23(b) (stating that "[a] class action may be maintained if Rule 23(a) is satisfied and if" one of Rule 23(b)'s three requirements is met). Rule 23(a)'s four requirements are (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. See, e.g., In re Cmty. Bank of N. Va., 622 F.3d 275, 291 (3d Cir. 2010).

Furthermore, Rule 23(b)(3), the subsection under which Plaintiffs seek class certification in this case, provides two additional requirements: predominance and superiority. See, e.g., id. As a final requirement, the class must also be clearly defined and objectively ascertainable. See Byrd v. BMW of N. Am., LLC, 687 F.3d 583, 591 (3d Cir. 2012).

A plaintiff has the burden of proving each of the above requirements by a preponderance of the evidence. In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 307 (3d Cir. 2008). The court "must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties." Id. The court must engage in a "rigorous" and individualized analysis of the above requirements before certifying a class. See id. ("Class certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met." (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982))); Byrd v. Aaron's, 784 F.3d 154, 172 (3d Cir. 2015) ("Precise analysis of relevant Rule 23 requirements will always be necessary.").

In this case, Plaintiffs seek to certify the following class:

> All individuals who: (1) entered into an independent contractor agreement with NFI, either personally or through a corporate entity; and (2) drove a vehicle on a full-time basis to perform deliveries of goods to Trader Joe's stores anywhere on the East Coast on behalf of NFI at any time since June 22, 2009.

[Docket No. 129-1, at 1.][2] With that proposed class in mind, the Court will now address each relevant Rule 23 requirement.

### 1.    Numerosity

Numerosity requires that "the class . . . be 'so numerous that joinder of all members is impracticable.'" Id. (quoting FED. R. CIV. P. 23(a)(1)). In the Third Circuit, a court will presume that numerosity is met if "the potential number of plaintiffs exceeds 40." Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001). Here, the proposed class consists of more than 40 individuals. [See Docket No. 148, at 8.] Therefore, the numerosity requirement is met.

### 2.    Commonality

Commonality requires that "questions of law or fact common to the class" exist. Id. (quoting FED. R. CIV. P. 23(a)(2)). Because this action is brought under Rule 23(b)(3), the Rule 23(a)(2) "commonality requirement 'is subsumed by the predominance requirement'" of Rule 23(b)(3). Danvers Motor Co. v. Ford Motor Co., 543 F.3d 141, 148 (3d Cir. 2008) (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 626 (3d Cir. 1996)). Therefore, this requirement will be discussed below with the predominance requirement.

---

[2] The Court notes its inherent authority to redefine a proposed class in order to maintain a class action. See FED. R. CIV. P. 23(c)(1); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 185 (1974) ("[A]s Rule 23(c)(1) clearly indicates, the courts retain both the power and the duty to realign classes during the conduct of an action when appropriate.").

### 3.    Typicality

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3); see also In re Cmty. Bank, 622 F.3d at 291. The Third Circuit has held that a court's typicality analysis must address

> three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

In re Schering Plough Corp. ERISA Litig., 590 F.3d 585, 599 (3d Cir. 2009).

Defendants' typicality challenge is limited to the first above factor. [See Docket No. 142, at 19-20.] They claim that Defendants' claims rely on "disparate liability theories" based on some of Named Plaintiffs' depositions. [See id.] But as Plaintiffs point out, Defendants' argument seems to do little more than cherry pick statements made by Named Plaintiffs while ignoring the claims actually set forth in Plaintiffs' Amended Complaint. [See Docket No. 148, at 12-13; Docket No. 102 (Amended Complaint).] Defendants' attempt to misconstrue Plaintiffs' claims will not be entertained by the Court. Instead, the Court agrees with Plaintiffs that typicality is met here, since "Plaintiffs and members of the proposed class were all classified as independent contractors, all signed the same [contracts], worked subject to the same controls, worked exclusively for NFI on a full-time basis, were subject to the same types of deductions, and were required to purchase their own worker's compensation

insurance." [Docket No. 129-1, at 20.] The factual and legal issues of Named Plaintiffs'
claims are typical of those of the rest of the class; the typicality requirement is satisfied.

### 4.    Adequacy

Adequacy requires that "the named plaintiffs . . . 'fairly and adequately protect
the interests of the class.'" In re Cmty. Bank, 622 F.3d at 291 (quoting FED. R. CIV. P.
23(a)(4)). This requires analysis of two factors: "(1) whether counsel is qualified,
experienced, and able to conduct the litigation; and (2) whether any conflicts of interest
exist between the named parties and the class they seek to represent." Carrow v. FedEx
Ground Package Sys., Inc., Civil No. 16-3026 (RBK/JS), 2019 WL 7184548, at *9 (D.N.J.
Dec. 26, 2019) (citing In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,
148 F.3d 283, 312 (3d Cir. 1998). Defendants do not address these factors, but instead
argue that adequacy is not satisfied here because "a plaintiff cannot adequately
represent 'people who possess different claims.'" [Docket No. 142, at 19 (quoting Harris
v. Marsh, 100 F.R.D. 315, 325 (E.D.N.C. 1983).] However, as noted above, the claims are
typical of the whole class, so Defendants' adequacy argument fails. Moreover, counsel
are indisputably "qualified, experienced, and able to conduct the litigation," [see Docket
No. 129-1, at 22 (recounting counsel's qualifications)], and there is no conflict, [see id. at
21]. Therefore, the adequacy requirement is met.

### 5.    Predominance

Predominance means "that the questions of law or fact common to class
members predominate over any questions affecting only individual members." See FED.
R. CIV. P. 23(b)(3). This does require some soothsaying from the Court, as it "must
formulate some prediction as to how specific issues will play out in order to determine
whether common or individual issues will predominate." In re Hydrogen Peroxide

Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2009) (quoting In re New Motor Vehicles

Can. Exp. Antitrust Litig., 522 F.3d 6, 20 (1st Cir. 2008)). "If proof of the essential

elements of the cause of action requires individual treatment, then class certification is

unsuitable." Id. (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259

F.3d 154, 172 (3d Cir. 2001)). A court, thus, must "examine the elements of plaintiffs'

claim 'through the prism' of Rule 23." Id. (quoting Newton, 259 F.3d at 172).

In this case, the central question for predominance is whether the class members

were misclassified as independent contractors instead of employees. [See Docket No.

129-1, at 13-20; Docket No. 142, at 22-28.][3] New Jersey courts use the so-called "ABC

test" to determine whether an individual is an employee or an independent contractor

for NJWPL claims. Hargrove v. Sleepy's, LLC, 106 A.3d 449, 465 (2015) ("Sleepy's I").

Under the ABC test, an individual who performs a service is presumed to be an

employee unless the employer proves that:

> (A)  Such individual has been and will continue to be free from control or
>      direction over the performance of such service, both under his
>      contract of service and in fact; and
> (B)  Such service is either outside the usual course of business for which
>      such service is performed, or that such service is performed outside of

---

[3] Defendants make three other arguments as well. First, they reassert the choice-of-law argument. [Docket No. 142, at 21.] For the reasons outlined above, that argument fails. Second, they argue that Plaintiffs' "evidence of illegal deductions is individualized." [Id. at 28 (alterations omitted).] Third, they argue that "evidence of damages is individualized." [Id. (alterations omitted).] However, as Plaintiffs indicate in their reply brief, these arguments are meritless. [Docket No. 148, at 19-20.] These issues can plainly be decided on common evidence, including spreadsheets already provided in discovery. See Carr v. Flower Foods, Inc., Civil Action No. 15-6391, Civil Action No. 16-2581, 2019 WL 2027299, at *17 (E.D. Pa. May 7, 2019) ("[B]ecause the same categories of deductions were routinely made by Defendants and subjected to the same treatment in the standard written agreements between the parties, the validity of those deductions will hinge on common questions of law."). Moreover, the Third Circuit has held that "obstacles to calculating damages may not preclude class certification" provided that the class can show "the fact of damages . . . on a common basis." Harnish v. Widener Univ. Sch. of Law, 833 F.3d 298, 306 (3d Cir. 2016). Plaintiffs have met that burden here.

> all the places of business of the enterprise for which such service is
> performed; and
>
> (C)  Such individual is customarily engaged in an independently
> established trade, occupation, profession or business.

N.J. STAT. ANN. § 43:21-19(i)(6)(A)-(C).

"In cases concerning the alleged misclassification of delivery drivers in other jurisdictions using ABC tests, federal courts have repeatedly found common evidence sufficient to satisfy all three prongs of the test." Carrow, 2019 WL 7184548, at *10 (citing various cases). The Court will address each in turn.

### i.    Prong A

As stated above, Prong A requires Defendants to show the drivers were free, in contract and in fact, from Defendants' control. N.J. STAT. ANN. § 43:21-19(i)(6)(A). Defendants claim that common evidence cannot answer either of these inquiries. [Docket No. 142, at 22-26.] Defendants argue that the drivers "signed materially different agreements depending on when they provided services to NFI," pointing to a handful of minor changes made over the course of the various agreements. [Id. at 4-5, 22.] In response, Plaintiffs counter that there are "ample terms showing NFI's control included in each of the contract iterations." [Docket No. 148, at 17.] They expand in a footnote:

> For example, terms requiring the drivers to provide their trucks to NFI
> exclusively for NFI's use, requiring the drivers to maintain GPS and
> communication systems approved by NFI, requiring the drivers to
> regularly submit their trucks for inspection, requiring the drivers to
> maintain logs and numerous other records and submit them to NFI,
> requiring the drivers to report all accidents or other issues to NFI
> immediately, prohibiting the drivers from assigning or subcontracting
> their obligations, maintaining insurance mandated by NFI, and providing
> NFI the ability to terminate the driver for any reason at NFI's discretion.

[Id. at 17 n.29.] Based on that evidence, the Court holds that common evidence can determine whether the drivers were contractually free from Defendants' control.

The Court also finds that common evidence can answer whether the drivers were factually free from Defendants' control. Plaintiffs point out that Defendants "required all of its delivery drivers to follow numerous policies, . . . issued instructions to all of its drivers through letters and weekly newsletters, and [Defendants'] managers and supervisors routinely used the Qualcomm [communication] system to provide instructions to its drivers while they performed their work." [Docket No. 129-1, at 18-19.] Defendants also tracked the drivers' locations with GPS devices, and automatically reported the drivers as off duty under certain circumstances. [Id.] Defendants argue that the application of these policies "varied in practice" and therefore require an individualized inquiry. [Docket No. 142, at 24-25.] It also claims some of the policies referenced by Plaintiffs were only in place to satisfy safety protocols and Department of Transportation requirements. [Id.] This is beside the point at this stage of the case. See Williams v. Jani-King of Philadelphia Inc., 837 F.3d 314, 322 (3d Cir. 2012) ("[T]he class certification stage is not the place for a decision on the merits."). Moreover, "evidence of common practices can establish common answers to control as a matter of fact." Carrow, 2019 WL 7184548, at *10 (quoting DaSilva v. Border Transfer of MA, Inc., 296 F. Supp. 3d 389, 401 (D. Mass. 2017)). Plaintiffs have shown such evidence in their Motion, so the question of control as a matter of fact can be resolved by common evidence. Therefore, the Court holds that Prong A can be resolved through common evidence.

18

### ii.    Prong B

As the Honorable Robert B. Kugler noted in a recent opinion on this issue, "[t]here is no real dispute that Prong B turns on common evidence, because the questions it raises — about the nature of the service provided, the usual course of business of the employer, and whether the service was performed at the employer's place of business — are fairly abstract, and do not vary by individual." Id. This Court finds that the <u>Carrow</u> court's analysis is equally applicable here, and that Prong B can be resolved on common evidence. Defendants concede that the first part of Prong B — whether the drivers performed services outside the usual course of Defendants' business — can be resolved on common evidence. [<u>See</u> Docket No. 142, at 26-27.] Instead, they argue that the drivers performed services "outside of all the places of business of" Defendants. [<u>Id.</u> at 26.] Defendants argue that this turns on "whether the amount of time a Contractor spent — and the work, if any, he performed — at Trader Joe's warehouses in Nazareth or Hatfield, Pennsylvania, establishes that he worked 'inside' NFI's places of business." [<u>Id.</u>] This, Defendants argue, cannot be answered by common evidence. [<u>Id.</u> at 26-27.]

In response, Plaintiffs cite a recent New Jersey Superior Court, Appellate Division case in which that court held that, because the business of a company that transports goods for its customers is "at no fixed place, . . . the places of defendants' business enterprise not only included its facility, but also extended to the various locations the truck drivers . . . were required to travel to perform services on defendants' behalf." <u>Morales v. V.M. Trucking, LLC</u>, Docket No. A-2898-16T4, 2019 WL 2932649, at *6 (N.J. Super. App. Div. July 9, 2019). In light of that decision, Defendants' argument cannot be successful: their "places of business" include both their own factories as well

as the Trader Joe's locations that the drivers delivered to. Therefore, Prong B can be resolved on common evidence.

### iii.    Prong C

Finally, Prong C requires that Defendants prove the drivers were "customarily engaged in an independently established trade, occupation, profession or business." N.J. STAT. ANN. § 43:21-19(i)(6)(C). As Judge Kugler wrote in Carrow, "[t]he thrust of prong C is determining whether the 'individual has a profession that will plainly persist despite the termination of the challenged relationship.'" Carrow, 2019 WL 7184548, at *10 (quoting Hargrove, 106 A.3d at 459). Additionally, the New Jersey Superior Court, Appellate Division, has held that Prong C requires that "[t]he employee must be engaged in such independently established activity at the time of rendering the service involved." Phila. Newspapers, Inc. v. Bd. of Review, 937 A.2d 318, 327 (N.J. Super. Ct. App. Div. 2007) (quoting Gilchrist v. Div. of Empl. Sec., 137 A.2d 29, 35 (N.J. Super. Ct. App. Div. 1957)).

In this case, Plaintiffs argue that they were precluded from operating as truly independent businesses. [Docket No. 129-1, at 17-18.] They point out that the drivers worked full-time for Defendants, they did not work for anybody else, they were prohibited from placing another business's merchandise on their trucks, they drove trucks with Defendants' logo and DOT number, and they pulled trailers owned by Defendants. [Id.] Defendants point out that some drivers worked for other companies "immediately after they stopped driving for NFI." [Docket No. 142, at 26-27.] However, Defendants do not argue that any drivers were able to work for another company while they worked for Defendants. The common evidence indicates that they were precluded

from doing so, in spite of Defendants' protestations. As such, Prong C can also be decided on common evidence.

In conclusion, each prong of New Jersey's ABC test can be decided based on common evidence in this case. Therefore, the predominance (and, resultingly, commonality) requirement is satisfied here.

### 6. Superiority

Superiority means "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." See FED. R. CIV. P. 23(b)(3). Rule 23(b)(3) further lists four "pertinent" factors to consider when determining if superiority is satisfied:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3)(A)-(D).

Defendants argue that these factors cut against a finding of superiority for a variety of reasons. [Docket No. 142, at 29-30.] They argue that the class would "disregard[] class members' interests in individually controlling the prosecution of their claims" and "deprive[] them of the ability to seek what they in fact want." [Id.] Defendants also reassert their claim that New Jersey law would not apply to all putative class members, and that the resulting conflict between applicable laws would "render a class action unmanageable," which is not true given the Court's rulings in this Opinion. [Id. at 30.]

Plaintiffs, of course, argue the opposite. They note that this case involves class members who "shared similar roles and responsibilities, . . . were all governed by a uniform corporate . . . policy, and . . . are all alleging that the [policy] was illegal," factors which cut in favor of a class action. Rivet v. Office Depot, Inc., 207 F. Supp. 3d 417, 432 (D.N.J. 2016). Moreover, the damages here stand to be relatively small for many individuals, who might otherwise be unable to pursue their claims individually. See id. (favoring class certification where members "will have little incentive to pursue their claims on an individual basis"). Finally, Plaintiffs point to a risk inherent to legal claims for workers in the employment context: retaliation. [Docket No. 129-1, at 28.] Class actions can help avoid the chilling effect that individual litigation might have on employees, thereby making it a superior option.

The Court agrees with Plaintiffs on the question of superiority. Despite Defendants' arguments, "no class member's interests in independently prosecuting his or her claim would be frustrated by certifying the class at issue here;" the Court has not been made aware of any other lawsuits brought by potential class members, nor have the class members "exhibited [any] interest in controlling the prosecution of this action in this forum or elsewhere." See Stair ex rel. Smith v. Thomas & Cook, 254 F.R.D. 191, 201 (D.N.J. 2008). Moreover, it is desirable to concentrate this litigation in this forum, especially considering that it has already been concentrated here for nearly five years. Finally, the parties do not note any substantial difficulties in managing this class action, and in fact for many reasons set out above, there are many reasons that a class action would be more manageable than other options, especially because of the reliance on common evidence here. See Carrow, 2019 WL 7184548, at *12. Therefore, the superiority requirement is also met here.

22

### 7.      Ascertainability

Ascertainability requires that "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasibly mechanism for determining whether putative class members fall within the class definition.'" Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015) (quoting Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 355 (3d Cir. 2013)). It "consists of nothing more than these two inquiries[a]nd it does not mean that a plaintiff must be able to identify all class members at class certification — instead, a plaintiff need only show that 'class members *can* be identified.'" Id. (quoting Carrera v. Bayer Corp., 727 F.3d 300, 308 n.2 (3d Cir. 2013)).

In this case, the class definition is plainly based only on objective criteria. Defendants argue that "full-time basis" cannot be an objective criterion because Plaintiffs "attempt[] to define it." [Docket No. 142, at 14.] This argument is illogical. A criterion needing to be defined has no bearing on whether it is objective or subjective. In this instance, the full-time criterion is clearly objective, as it is demonstrable by evidence that does not rely, for instance, on "class members' state of mind." See City Select Auto Sales v. BMW Bank of N. Am. Inc., 867 F.3d 434, 439 n.3 (3d Cir. 2017). Defendants other arguments about this first ascertainability effectively attempt to force Plaintiffs to identify all class members individually, which they are not required to do at this stage. Therefore, the Court finds that the criteria of the class is objective, and the first ascertainability requirement is met.

Defendants also argue that the second requirement is not met. It relies on two cases in making this argument: Hargrove v. Sleepy's, LLC, No. 10-01138 (PGS), 2018 WL 1092457 (D.N.J. Feb. 28, 2018) ("Sleepy's II"), and a previous iteration of the above-discussed Carrow case. [Docket No. 142, at 16-17.] The Carrow case upon which

their argument relies no longer supports their theory, as Judge Kugler has since issued an opinion, discussed above, that grants class certification in a case similar to this one. See Carrow, 2019 WL 7184548. Meanwhile, Sleepy's II is distinguishable from this case, as Plaintiffs point out. In that case, the court denied class certification in part because of a lack of clear records to show what putative class members suffered allegedly improper wage deductions. See Sleepy's II, 2018 WL 1092457, at *7-8. Specifically, in that case, the plaintiffs attempted to cross-reference multiple sets of incomplete data taken from different time periods to show ascertainability. See id. at *3. Conversely, in this case, "NFI produced spreadsheets that listed each contractor, the individuals who drove for each contractor in addition to the contractor himself (i.e., secondary drivers), and the number of deliveries completed by each individual." [Docket No. 148, at 9.] There is no lack of sufficient data here as there was in Sleepy's II. See also Carrow, 2019 WL 7184548, at *12 (distinguishing that case from Sleepy's II based on similar data as is present in this case). In this case, the data is complete and covers the entirety of the class period. Moreover, to the extent that Defendants have not yet disclosed the needed data with respect to certain potential class members, they admit that they can easily do so once the class has been certified. [See Docket No. 149-3, at 33-34.]

Defendants also point out that, like in Sleepy's II, they "often contracted with — and thus paid — business entities rather than individuals," and those entities went on to pay their individual drivers. [Docket No. 142, at 16.] Defendants claim that "Named Plaintiffs offer no mechanism for identifying individual people who experienced deductions from their wages." [Id. at 17.] But, as Plaintiffs point out, the proposed class would only consist of those individuals who "(1) entered into an independent contractor agreement with NFI, either personally or through a corporate entity; and (2) drove a

24

vehicle on a full-time basis." In other words, "Plaintiffs only seek to include as class members the contractors who actually drove for themselves," not sub-contractors whose relationship with NFI reflects the more tenuous connection Defendants warn of. Courts have found such a class to be ascertainable. See, e.g., Carrow, 2019 WL 7184548, at *12; Carr v. Flower Foods, Inc., Civil Action No. 15-6391, Civil Action No. 16-2581, 2019 WL 2027299, at *10 (E.D. Pa. May 7, 2019).

Therefore, the Court finds that the class is clearly defined and ascertainable here. Moreover, all of the relevant Rule 23 requirements are met, so the Court will grant class certification.

## IV.  **Conclusion**

For the reasons expressed above, the Court will grant Plaintiffs' Motion for Class Certification, though it will slightly alter Plaintiffs' proposed class in light of the findings of this Opinion. The following class is certified under Rule 23(b)(3):

1. All individuals who: (1) entered into, either personally or through a corporate entity, an independent contractor agreement with NFI that had a New Jersey choice-of-law clause; and (2) drove a vehicle on a full-time basis to perform deliveries of goods to Trader Joe's stores anywhere on the East Coast on behalf of NFI at any time since June 22, 2009.
2. "Full-time basis" means having delivered at least 80% of the loads assigned to the contractor.

An accompanying Order shall issue.


June 30, 2020                                           s/Joseph H. Rodriguez
Date                                                    JOSEPH H. RODRIGUEZ
                                                        United States District Judge