**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| JOHN F. PORTILLO, RAFAEL SUAREZ, MARTIN DURAN, GERMAN BENCOSME, EDIN VARGAS, LUIS A. HERNANDEZ, JOSUE PAZ, and ALVARO CASTANEDA, individually and on behalf of all others similarly situated, | : : : : : : : : : | No. 15-cv-07908-JHR-MJS **Opinion** |
| *Plaintiffs*, | : : | |
| v. | : : | |
| NATIONAL FREIGHT, INC. and NFI INTERACTIVE LOGISTICS, INC., | : : : : | |
| *Defendants.* | : : | |

Plaintiffs in this case are a class of commercial truck drivers who allege that Defendants National Freight, Inc. and NFI Interactive Logistics, LLC (collectively "NFI") misclassified them as independent contractors and that, due to this misclassification, certain deductions from Plaintiffs' pay violated the New Jersey Wage Payment Law, N.J. Stat. Ann. § 34:11–4.1 et seq. ("WPL"). Before the Court are cross motions for summary judgment on the issue of whether the driver Plaintiffs were independent contractors or employees of NFI under New Jersey law. NFI also moves for summary judgment on the issue of whether federal law preempts Plaintiffs' WPL claims, whether some deductions were unlawful, and whether certain Plaintiffs who signed general releases can recover. For the reasons set forth below, the Court will grant Plaintiffs' motion. The Court will also grant NFI's motion as to the Plaintiffs who signed releases, but will otherwise deny NFI's motion.

1

## I.    Background

NFI[1] is a third-party logistics company that provides transportation services to its clients. [Dkt. 285, Pls' Opp. to NFI's SUMF ¶¶ 1–2].[2]  Those services include "dedicated contract carriage," whereby NFI provides trucks, trailers, drivers, and other personnel necessary to transport a client's goods from one location to another.  [Dkt. 285, Pls' Opp. to NFI's SUMF ¶¶ 2–3].  To perform these carriage services, NFI uses "company drivers" who do not own their own their own trucks, and "owner operators" who own their own semi-tractor trucks.  [*See* Dkt. 276, NFI's Opp. to Pls' SUMF ¶ 13; Dkt. 285, Pls' Opp. to NFI's SUMF ¶ 10].  NFI classified company drivers as NFI employees and owner operators as independent contractors.

The named Plaintiffs in this case represent a class of owner operators who drove for NFI from 2009 to 2014 (the "Relevant Period"), and who primarily delivered goods to and from Trader Joe's retail stores on the east coast.  [*See* Dkt. 276, NFI's Opp. to Pls' SUMF ¶ 1].[3] Before driving for NFI, seven of the eight named Plaintiffs drove as owner operators for another trucking company, and the eighth drove for that company as a company driver.  [Dkt. 285, Pls' Opp. to NFI's SUMF ¶ 11].  These Plaintiffs primarily delivered goods to Trader Joe's stores for the predecessor company.  [*Id.*].

___

[1] National Freight, Inc. and NFI Interactive Logistics, LLC are both organized in New Jersey and operate principally in New Jersey.  Until 2019, NFI maintained its headquarters in Cherry Hill, New Jersey.  [Dkt. 280-1, Hayden Decl. ¶ 6].  Since 2019, its headquarters have been in Camden, New Jersey.  [*Id.*].

[2] "SUMF" refers to the statements of undisputed material facts submitted by the parties pursuant to Local Rule 56.1.

[3] NFI does not contract directly with Trader Joes, but provides delivery services to Trader Joes pursuant to a "Transportation Services Agreement" with a third party WCD Logistics, LLC. [Dkt. 280-1, Hayden Decl. ¶ 20].

### a. Contractual Relationship Between Plaintiffs and NFI

Three different Independent Contractor Operating Agreements ("ICOA") form the basis for Plaintiffs' relationship with NFI: the "2009 ICOA," the "2010 ICOA," and the "2017 ICOA." [*See* Dkt. 190-13–17].  Each Plaintiff signed one or more of these ICOAs depending on when he drove for NFI.  Some Plaintiffs contracted directly with NFI as sole proprietors, while others signed on behalf of businesses that they owned.  [Dkt. 285, Pls' Opp. to NFI's SUMF ¶ 36, 36 n.36].

Though the ICOAs changed over time, several key provisions remained constant.  The ICOAs required that Plaintiffs or their businesses owned their own trucks.  [*See* Dkt. 285, Pls' Opp. to NFI's SUMF ¶ 48].  The ICOAs provided that Plaintiffs would lease their trucks to NFI and provide transportation services to NFI using those trucks.  [*E.g.* Dkt. 145-5, 2010 ICOA ¶ 1(a); Dkt. 190-15, 2017 ICOA ¶ 1(a)].[4]  The ICOAs provided that NFI would have "exclusive possession, control, and use" of Plaintiffs' trucks so long as the ICOAs were in effect.  [*E.g.* Dkt. 145-11, 2009 ICOA ¶ 2; Dkt. 145-5, 2010 ICOA ¶ 3; Dkt. 190-15, 2017 ICOA ¶ 3].  The ICOAs also authorized Plaintiffs to sublease their trucks back from NFI, to use the trucks for other purposes, and to hire other drivers to complete Plaintiffs' driving responsibilities for NFI.[5]  [Dkt.

---

[4] This arrangement triggered a host of federal regulations issued by the Federal Motor Carrier Safety Administration ("FMCSA") with which NFI had to comply.  Many ICOA provisions explicitly refer to and/or mirror the language of FMCSA regulations.  [*See, e.g.,* Dkt. 190–13, 2009 ICOA ¶ 3.A.1 ("It is mutually understood that [NFI's] business is regulated by the Federal Motor Carrier Safety Administration … and various rules and regulations of the, [sic] FMCSA … including among others, rules and regulations governing identification of vehicles, information required o receipts and bills, safety, qualifications of drivers, driving of motor vehicles, parts and accessories necessary for safe operation….")].

[5] Though there is no dispute that the ICOAs permitted Plaintiffs to have other drivers drive their trucks, the parties dispute whether and to what extent Plaintiffs were free to do so in practice. [*See* Dkt. 285, Pls' Opp. to NFI's SUMF ¶¶ 117–18].

145-11, 2009 ICOA ¶ E; 145-5, 2010 ICOA ¶¶ 6(b), 7(a); Dkt. 190-15, 2017 ICOA ¶¶ 1(c), 7(a)].  In each ICOA, the parties agreed that Plaintiffs would work for NFI as independent contractors and not as employees.  [*E.g.* Dkt. 145-5 at 4, 2010 ICOA ¶ 7].

The ICOAs defined how NFI would compensate Plaintiffs for their work.  Each ICOA provided that NFI would pay Plaintiffs a flat per-mile rate.  [*E.g.* Dkt. 145-5 at 11, 2010 ICOA Attachment A ¶ 1; Dkt. 190-15, 2017 ICOA Attachment A ¶ 1].[6]  The ICOAs listed other tasks for which Plaintiffs would be compensated if Plaintiffs performed those tasks, and events for which Plaintiffs would be compensated if those events occurred.  [Dkt. 285, Pls' Opp. to NFI's SUMF ¶¶ 51–55].  The ICOAs also listed expenses for which NFI would reimburse Plaintiffs, such as tolls and fuel surcharges.[7]  [Dkt. 285, Pls' Opp. to NFI's SUMF ¶¶ 56, 58].

Other relevant details of the ICOAs include:

- The ICOAs indicated that Plaintiffs would be responsible for all "operating expenses," including fuel, supplies, and the cost of repairs.  [Dkt. 190-14, 2010 ICOA ¶ 8(a); Dkt. 190-15, 2017 ICOA ¶ 8(a)].

- The ICOAs required Plaintiffs to deposit money into an escrow account from which NFI could deduct funds "utilized towards the payment of items necessary to fulfill [Plaintiffs'] contractual agreement with [NFI]."  [Dkt. 190-13, 2009 ICOA ¶ O; Dkt. 190-15, 2017 ICOA ¶ 19].

- The ICOAs required Plaintiffs always to maintain various forms of insurance at their own expense, including "non-trucking liability insurance,"[8] workers' compensation or occupational accident insurance, and passenger insurance.  [*See*

---

[6] The 2009 and 2010 ICOAs indicated that mileage would be calculated using the "Rand McNally Mile Maker" mileage calculation system.  [*E.g.* Dkt. 145-11, 2009 ICOA Exh. A].

[7] Under this fuel surcharge, NFI would increase or decrease Plaintiffs' per-mile compensation if fuel prices increased above or decreased below a national average price for diesel fuel as published on the United States Energy Administration's website.  [Dkt. 285, Pls' Opp. to NFI's SUMF ¶ 58].

[8] The 2009 ICOA refers to this insurance as "bobtail" insurance.  [Dkt. 190-13, 2009 ICOA § 6(B)].

Dkt. 190-15, 2017 ICOA Attachment C ¶ 2]. The ICOAs generally[9] permitted Plaintiffs to procure their own insurance policies or to purchase insurance through NFI. [Dkt. 190-14, 2010 ICOA Attachment C ¶ 5; Dkt. 190-14, Attachment C ¶¶ 2, 5(a)]. If Plaintiffs elected to purchase their insurance through NFI, they also authorized NFI to deduct the insurance cost from Plaintiffs' pay or escrow account. [Dkt. 190-14, 2010 ICOA Attachment C ¶ 5; Dkt. 190-14, Attachment C ¶ 5(a)]. One Plaintiff testified that he preferred to have NFI handle insurance payments. [*E.g.* Dkt. 280-7, 7/8/2019 Castaneda Dep. 150:24–152:10].

- The ICOAs required Plaintiffs to install, maintain, and pay for communication and tracking equipment in their trucks, [*e.g.* Dkt. 145-5, 2010 ICOA ¶ 8(g)], which NFI used to communicate with Plaintiffs as they were driving. [*E.g.* Dkt. 190-2, 7/23/2019 Bencosme Dep. 145:2–6]. Although Plaintiffs generally referred to this equipment as their "Qualcomm" device, [*e.g.* Dkt. 190-2, 7/23/2019 Bencosme Dep. at 145:2–13], only the 2009 ICOA explicitly referred to and required Qualcomm brand products. [Dkt. 190-13, 2009 ICOA at 9]. This equipment also allowed NFI to monitor Plaintiffs' progress as they drove. [*See* Dkt. 276, NFI's Opp. to Pls' SUMF ¶ 52]. The 2010 and 2017 ICOAs permitted Plaintiffs to purchase their Qualcomm equipment or to rent the equipment from NFI, [Dkt. 145-5 at 6, 2010 ICOA ¶ 8(g); Dkt. 190-15, 2017 ICOA ¶ 8(g)], while the 2009 ICOA required Plaintiffs to rent the equipment from NFI. [Dkt. 145-11 at 9, 2009 ICOA Ex. A at 2]. Plaintiffs authorized NFI to deduct "messaging and usage" costs from their paychecks or escrow accounts. [*E.g.* Dkt. 190-15, 2017 ICOA ¶ 8(g)].

- The ICOAs indicated that Plaintiffs would receive a credit card that they could use to purchase fuel. [*E.g.*, Dkt. 190-13 at 9, 2009 ICOA at 9; Dkt. 190-14 at 5, 2010 ICOA ¶ 8(e)]. The ICOAs stated that, if Plaintiffs used this card, NFI was authorized to deduct fuel costs from Plaintiffs' pay or escrow account. [Dkt. 190-13 at 9, 2009 ICOA at 9; Dkt. 190-14 at 5, 2010 ICOA ¶ 8(e); Dkt. 190-15 at 9, 2017 ICOA ¶ 8(e)].

**b. Plaintiffs' Work and Interaction with NFI**

From 2009 to 2019, NFI transported grocery products from a warehouse in Nazareth, Pennsylvania (the "Nazareth Warehouse") to Trader Joe's retail stores on the east coast. [Dkt. 285, Pls' Opp. to NFI's SUMF ¶ 77]. NFI did not own the Nazareth Warehouse. [*See* Dkt. 285, Pls' Opp. to NFI's SUMF ¶ 84]. NFI maintained an office in a double-wide trailer in the parking

---

[9] The 2009 ICOA required Plaintiffs to purchase through NFI their bobtail insurance and occupational accident insurance if plaintiffs elected to purchase occupational accident insurance rather than workers' compensation insurance. [Dkt. 190-13, 2009 ICOA ¶¶ 6(B)(D)].

lot of the Nazareth Warehouse which it staffed with employees whose titles varied but included managers, dispatchers, and supervisors. [Dkt. 276, NFI's Opp. to Pls' SUMF ¶ 17]. NFI also transported "frozen grocery products" from a warehouse in Hatfield, Pennsylvania (the "Hatfield Warehouse") to Trader Joe's stores beginning in 2010, but moved these operations to the Nazareth Warehouse in August 2013. [Dkt. 285, Pls' Opp. to NFI's SUMF ¶¶ 78, 81]. NFI did not own the Hatfield Warehouse but maintained an office inside. [*See* Dkt. 285, Pls' Opp. to NFI's SUMF ¶ 84]. Three NFI employees, a manager and two coordinators, worked in this office from 2010 to 2013. [Dkt. 280-2, Motzer Decl. ¶ 7]. The Court will refer to the Nazareth and Hatfield Warehouses collectively as the "Warehouses," and to the offices maintained at the Nazareth and Hatfield Warehouses as the "Warehouse Offices."

Plaintiffs' face-to-face interactions with NFI personnel occurred primarily at the Warehouse Offices, and some Plaintiffs signed their ICOAs at the Warehouse Offices. [*See* Dkt. 190-13, Bencosme 2009 ICOA Ex. A; Dkt. 280-7, 7/8/2019 Castaneda Dep. 150:5–7]. NFI also stored the NFI-owned trailers used to transport its clients' goods in the parking lots outside of the Warehouses. [Dkt. 276, NFI's Opp. to Pls' SUMF ¶ 18].

Plaintiffs began their shifts by reporting to the Warehouse Offices. When Plaintiffs arrived, they conferred onsite with NFI employees about the route that Plaintiffs would drive that day and picked up a preloaded trailer that they would drive that day along with any necessary paperwork. [Dkt. 276, NFI's Opp. to Pls' SUMF ¶ 18; Dkt. 285, Pls' Opp. to NFI's SUMF ¶ 98]. Some Plaintiffs fueled their trucks using NFI's on-site fuel pumps. [*E.g.* Dkt. 190-6, 9/26/2017 Paz Dep. 63:3–7; Dkt. 190-9, 8/1/2019 Vargas Dep. 12:2–6, 15–20; Dkt. 280-11, 8/2/2019 Hernandez Dep. 25:1–26:11]; Dkt. 190-14 at 14, 2011 ICOA Attachment B (noting that "Bulk-Fueling Facilities" belonged to NFI)]. Plaintiffs then departed to deliver the loads to

Trader Joe's stores across the east coast.  When they arrived at a store, Plaintiffs were required to

notify NFI of their arrival, as this was a Trader Joe's customer requirement.  [Dkt. 190-10,

Jucknik Dep. 22:6-23:19].  Plaintiffs unloaded the goods from the trailer onto a designated

location at each store, such as a loading dock.  [Dkt. 285, Pls' Opp. to NFI's SUMF ¶ 101].

Plaintiffs then obtained proof of delivery paperwork and departed.  [Dkt. 285, Pls' Opp. to NFI's

SUMF ¶ 102].  Plaintiffs returned to the Warehouses to drop-off NFI's trailer, and to the

Warehouse Offices to provide the proof of delivery to NFI's on-site employees.  [Dkt. 285, Pls'

Opp. to NFI's SUMF ¶ 106].  Deliveries could take a few hours or the entire day depending on

the route, and drivers sometimes slept in their trucks while on the road.  [Dkt. 285, Pls' Opp. to

NFI's SUMF ¶¶ 100, 103].  Occasionally, Plaintiffs returned items such as pallets and milk

crates from Trader Joe's stores to the Warehouses.  [*See* NFI's Opp. to Pls' SUMF ¶ 22].

### c.  Reduction in Force and Releases

In the summer of 2018, after this litigation commenced, NFI lost approximately fifty

percent of its business at the Nazareth Warehouse when Trader Joe's shifted its operations to a

competitor-owned warehouse in Connecticut.  [Dkt. 285, Pls' Opp. to NFI's SUMF ¶¶ 121–22].

NFI's need for drivers decreased and NFI terminated its ICOAs with some owner operators.  [*Id.*

¶ 123].  For the drivers who were being terminated, NFI offered $6,000 in exchange for signing a

general release (the "Release").  [*Id.* ¶ 124].  Plaintiffs' counsel learned of and objected to the

Release offer and demanded that a curative notice be sent to advise drivers that signing the

Release could affect their ability to participate in this lawsuit.  [*Id.* ¶ 125].  Plaintiffs' counsel

drafted the notice, which NFI then mailed to drivers who received the Release.  [*Id.* ¶ 127].  The

notice states that drivers who sign the release "**may be releasing your right to participate in a**

**lawsuit, Portillo et al. v. National Freight, Inc., et al., Civ. Act. No. 15-cv-7908-JBS-KMW,**

**which is currently pending before the United States District Court for the District of New Jersey."** [*Id.* ¶ 128 (emphasis in original)]. The notice advised that drivers who already signed the Release could notify NFI that they wished to revoke their agreement. [*Id.* ¶ 129]. Twenty Plaintiffs signed the Release without seeking revocation. [*Id.* ¶ 130].

### d. Relevant Procedural History

The procedural history in this case is extensive, so the Court will only discuss the procedural events relevant to the present motions for summary judgment. Plaintiffs commenced this action in the Superior Court of New Jersey, Camden County on June 22, 2015. [*See* Dkt. 1]. The initial complaint alleged that Plaintiffs are employees under Massachusetts' Independent Contractor Statute, and that NFI violated the Massachusetts wage law. [Dkt. 1-3 ¶ 1]. NFI removed the case to federal court, alleging federal question jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), 1453(b). [Dkt. 1]. The case was assigned to the late Judge Simandle. Plaintiffs moved to remand the case to state court, [Dkt. 4], and Judge Simandle denied the motion. [Dkt. 12]. Plaintiffs' Massachusetts claims survived a motion to dismiss for failure to state a claim. [Dkt. 48].

NFI then moved for summary judgment, arguing that Plaintiffs' claims cannot survive because Massachusetts law does not apply to Plaintiffs' claims. [Dkt. 66]. Plaintiffs responded by filing a motion for declaratory judgment, seeking a declaration that New Jersey law applies to Plaintiffs' claims. [Dkt. 78]. Judge Simandle agreed that New Jersey law applies to Plaintiffs' wage claims. [Dkt. 95]. Plaintiffs then filed an amended complaint (the "Amended Complaint") where they repleaded their Massachusetts claims as violations of New Jersey's WPL. [Dkt. 102]. The Amended Complaint is the operative pleading.

The Amended Complaint alleges that NFI misclassified Plaintiffs as independent contractors because NFI treated Plaintiffs as employees even though the ICOAs identify Plaintiffs as independent contractors.  [*See* Am. Compl. ¶ 31].  The Amended Complaint alleges that, because Plaintiffs were employees, NFI violated the WPL when it withheld funds for the cost of insurance, communication and tracking equipment, and fuel, among other things.  [Am. Compl. ¶ 29–30].  The Amended Complaint also alleges that NFI failed to compensate Plaintiffs for all of the miles that they drove and for all of the tasks that Plaintiffs performed at NFI's instruction.  [Am. Compl. ¶¶ 27–28].  The Amended Complaint alleges that, by withholding funds for these expenses, NFI deprived Plaintiffs of a portion of their wages.  [*See* Am. Compl. ¶ 43].

Plaintiffs eventually moved to certify a class under Federal Rule of Civil Procedure 23(b)(3).  [Dkt. 129, 130].  The Court granted this motion to certify and defined Plaintiffs' class to include

> 1.  All individuals who: (1) entered into, either personally or through a corporate entity, an independent contractor agreement with NFI that had a New Jersey choice-of-law clause; and (2) drove a vehicle on a full-time basis to perform deliveries of goods to Trader Joe's stores anywhere on the East Coast on behalf of NFI at any time since June 22, 2009.
>
> 2.  "Full-time basis" means having delivered at least 80% of the loads assigned to the contractor.

[Dkt. 169, 170].  In deciding this motion, the Court determined that Judge Simandle's conclusion that New Jersey law applies to the named Plaintiffs' claims extended to absent class member Plaintiffs who meet the class criteria.  [Dkt. 169 at 11].  The Court approved class notices under Rule 23(c)(2)(B) and ordered that the notices be disseminated.  [*See* Dkt. 182].

After the class was certified, Plaintiffs filed the motion for summary judgment presently before the Court.  [*See* Dkt. 187–190].  NFI cross-moved for summary judgment.  [Dkt. 276–280].

## II. Standard of Review

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  *Pearson v. Component Tech. Corp*., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *accord* Fed. R. Civ. P. 56(c).  Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  *Id.*  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp*, 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  *Id.*; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258

(D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the

nonmoving party must identify specific facts and affirmative evidence that contradict those

offered by the moving party.  *Anderson*, 477 U.S. at 256–57.

In deciding the merits of a party's motion for summary judgment, the court's role is not

to evaluate the evidence and decide the truth of the matter, but to determine whether there is a

genuine issue for trial.  *Anderson*, 477 U.S. at 249.

## III.    Analysis

Plaintiffs move for summary judgment only on the issue of whether they were

independent contractors or NFI employees under New Jersey law.  [*See* Dkt. 188 at 8].  NFI

cross-moves for summary judgment on this same issue, but also seeks a ruling that federal law

preempts Plaintiffs' WPL claims or, alternatively, that New Jersey law permits some of the

allegedly unlawful deductions.  [Dkt. 278].  NFI also seeks a ruling that the Plaintiffs who signed

the Release cannot proceed with their claims.  The Court will address these issues in turn.

### a.   Whether Plaintiffs are Employees or Independent Contractors Under New Jersey Law

Plaintiffs allege that NFI deducted certain expenses from Plaintiffs' wages in violation of

New Jersey's WPL, which governs "the time and mode of payment of wages due to employees."

*Hargrove v. Sleepy's, LLC*, 106 A.3d 449, 457 (N.J. 2015).  Unless an exception applies, the

WPL requires "every employer [to] pay the full amount of wages due to his employees…."  N.J.

Stat. Ann. § 34:11-4.2.  With limited exceptions, the WPL also prevents employers from

contracting around their wage payment obligations.  *Id.* § 34:11-4.7.  If an employer fails to

fulfill its obligations, the WPL permits employees to sue to recover the "full amount of [their]

wages."  *Id.*  "Although the Wage law does not include a legislative statement of intent, its

enactment leads to the conclusion that the statute was designed to protect employees' wages and

to guarantee receipt of the fruits of their labor." *Rosen v. Smith Barney, Inc.*, 925 A.2d 32, 37 (N.J. Super. Ct. App. Div. 2007), *aff'd*, 950 A.2d 205 (N.J. 2008).  The WPL is therefore a "remedial statute" that should be "liberally construed" to effectuate its remedial purpose. *Hargrove*, 106 A.3d at 457.

The WPL governs wage payments from "employers" to "employees."  The WPL defines an employee as "any person suffered or permitted to work by an employer, except that independent contractors and subcontractors shall not be considered employees."  N.J. Stat. Ann. § 34:11-4.1(b).  But the WPL does not instruct on how to distinguish between "employees" and "independent contractors."

The Supreme Court of New Jersey filled this legislative gap in *Hargrove v. Sleepy's, LLC*. 106 A.3d at 453.  *Hargrove* adopted the three-part "ABC" test set forth in New Jersey's Unemployment Compensation Law ("UCL"), N.J. Stat. Ann. § 43:21-1, to determine whether a worker is a contractor or employee for the purposes of the WPL.[10]  The ABC test provides:

> Services performed by an individual for remuneration shall be deemed to be employment subject to this chapter … unless and until it is shown to the satisfaction of the division that:
>
> > (A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and
> >
> > (B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
> >
> > (C) Such individual is customarily engaged in an independently established trade, occupation, profession or business.

---

[10] The *Hargrove* court also considered tests from the Restatement (Second) of Agency and various federal statutes, including the "right to control test," the "hybrid test," and the "economic realities test."  *Hargrove*, 106 A.3d at 459–62.  But *Hargrove* concluded that the ABC test served the New Jersey Legislature's intent and the WPL's remedial purpose better than these other tests.  *See id.* at 463–65.

*Id.* § 43:21-19(i)(6).  The ABC test presumes that workers are employees and requires putative employers to prove otherwise by satisfying each element of the ABC test.  *Echevarria et al. v. Williams Sonoma, Inc. et al.*, No. CV 15-6441, 2016 WL 1047225, at *7 (D.N.J. Mar. 16, 2016). Failure to satisfy any one element means that a worker is an "employee" under the WPL.  *Id.*

Plaintiffs contend that NFI cannot meet any of these three elements based on available evidence.  [Dkt. 188 at 30–48].  NFI offers two counter arguments.  First, NFI argues that a statutory exclusion within the UCL bars application of the ABC test altogether and requires that Plaintiffs are contractors as a matter of law.  [Dkt. 278 at 27–31].  Second, NFI argues that, if the ABC test applies, NFI satisfies each element.  [Dkt. 278 at 31–45].

### i. Statutory Exclusion

The UCL excludes twenty-five categories of services from the ABC test's definition of "employment," including:

> Services performed by operators of motor vehicles weighing 18,000 pounds or more, licensed for commercial use and used for the highway movement of motor freight, who own their equipment or who lease or finance the purchase of their equipment through an entity which is not owned or controlled directly or indirectly by the entity for which the services were performed and who were compensated by receiving a percentage of the gross revenue generated by the transportation move or by a schedule of payment based on the distance and weight of the transportation move;

N.J. Stat. Ann. § 43:21-19(i)(7)(X).[11]  The Court will refer to this provision as "Exclusion X." NFI argues that Exclusion X applies here because Plaintiffs drove trucks weighing at least 18,000 pounds and satisfy all other criteria.  [Dkt. 278 at 27–31].

---

[11] For Exclusion X and all other exclusions to apply, putative employers must show that they are exempt from paying federal unemployment taxes ("FUTA").  *See* N.J. Stat Ann. § 43:21-19(i)(7).

Plaintiffs disagree.  They claim that Exclusion X does not apply because it is a UCL provision that has no bearing on Plaintiffs' WPL claims.  [Dkt. 284 at 20–27].  Even if Exclusion X can apply to Plaintiffs' WPL claims, Plaintiffs argue that Plaintiffs do not meet Exclusion X's criteria.  [Dkt. 284 at 16–20].

### A.  Applicability of UCL Exclusion to Plaintiffs' WPL Claims

As noted above, the Supreme Court of New Jersey found in *Hargrove v. Sleepy's* that courts must apply the ABC test enumerated in the UCL statute to determine whether workers are "employees" for the purposes of the WPL.  *Hargrove*, 106 A.3d at 465.  *Hargrove* did not mention the UCL's twenty-five statutory exclusions when adopting UCL's ABC test and therefore did not explicitly decide one way or the other whether these exclusions apply to WPL claims.  Further, the text of the WPL does not contain the UCL's twenty-five exclusions.  Thus, the issue here is whether the *Hargrove* court implicitly adopted the UCL's statutory exclusions— including Exclusion X—for WPL claims when it adopted the ABC test.

NFI contends that *Hargrove* necessarily incorporates the UCL's statutory exclusions, including Exclusion X.  According to NFI, these exclusions preempt the ABC test's application altogether because they identify categories of work that cannot be deemed "employment" regardless of the outcome of the ABC test.  [Dkt. 278 at 28].  NFI insists that it would be illogical to find that *Hargrove* adopted the ABC test without also adopting these categories of work to which the ABC test cannot apply.  [Dkt. 278 at 29–30].  Similarly, NFI argues that it would be illogical to find that a worker is a contractor under the UCL and an employee under the WPL when both statutes apply the same ABC test.  [*Id.*].

The New Jersey Superior Court, Appellate Division recently considered and rejected these arguments in *Kennedy v. Weichert Co.*, No. A-0518-19, 2021 WL 2774844, at *5–*6 (N.J.

14

Super. Ct. App. Div. July 2, 2021), *leave to appeal granted*, 263 A.3d 193 (N.J. 2021).  In

*Kennedy*, the defendants argued that an analogous statutory UCL exemption for real estate

salespersons precluded the plaintiff from arguing that he was an employee in his WPL suit.  *Id.*

at *5.  The Appellate Division disagreed.  At the outset, the Appellate Division rejected the

view—proposed by NFI here—that the UCL exemptions logically and analytically precede

consideration of the ABC test.  The court found that "in specially treating real estate salespersons

under the UCL, the Legislature did not alter the generally applicable independent contractor test.

The Legislature evidently granted real estate brokers and salespersons an exemption not because

the ABC test did not apply; but because it did."  *Id.* at *6.  The *Kennedy* court then explained that

*Hargrove* merely adopted the UCL's ABC test for the purposes of distinguishing employees

from independent contractors, and did not collapse the WPL into the UCL as if they were one

statute.  *Id.*

      The *Kennedy* court then found that the WPL's text and history did not support the

application of UCL exclusions to WPL claims.  The court observed that earlier versions of the

WPL excluded workers in certain industries, but that the state Legislature eliminated those

exclusions and placed "only independent contractors and subcontractors entirely beyond its

reach."  *Id*.  *Kennedy* then found that that the Legislature "could have said so" if it intended to

apply the UCL's twenty-five exclusions to the WPL and, therefore, that grafting the UCL's

exclusions onto the WPL would frustrate the Legislature's intent.  *See id.*  The *Kennedy* court

also rejected the concern that workers could be considered employees under the WPL and

contractors under the UCL, repeating the principle that "[a]n individual may be considered an

employee for some purposes but an independent contractor for others."  *Id.* at *5 (quoting

*MacDougall v. Weichert*, 677 A.2d 162 (N.J. 1996)).  The *Kennedy* court concluded that the

"UCL's special treatment" of some categories of workers "does not render the ABC test inappropriate to determine [those workers'] independent-contractor status under the WPL." *Id.* at *7.

NFI urges the Court not to follow *Kennedy*.  NFI first points out that *Kennedy* is an unpublished opinion and therefore is not binding on the Court.  [Dkt. 293 at 8].  But even if federal courts "are not bound by unpublished state court decisions, we may look to them as persuasive authority when ascertaining state law."  *Kerrigan v. Otsuka Am. Pharm., Inc.*, 560 F. App'x 162, 166 n.4 (3d Cir. 2014) (citing *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 152 & n.6 (3d Cir. 1988)).

NFI further argues that *Kennedy* is "unsettled law" because the Supreme Court of New Jersey has agreed to review the Appellate Division's ruling in *Kennedy*.  [Dkt. 293 at 8].  *See also Kennedy v. Weichert Co.*, 263 A.3d 193 (N.J. 2021).  No doubt, the Supreme Court of New Jersey could disagree with the Appellate Division's ruling.  But the New Jersey Department of Labor ("DOL") endorsed the Appellate Division's ruling in an amicus brief to the Supreme Court.  *See* DOL Amicus Br. at 13–28, *Kennedy v. Weichert Co. D/B/A/ Weichert Realtors*, No. 086060 (N.J.).  As the Supreme Court of New Jersey acknowledged in *Hargrove*, New Jersey courts give "great deference" to the DOL's interpretation of the laws and regulations for which the DOL is responsible.  *Hargrove*, 106 A.3d at 456 (quoting *N.J. Ass'n of Sch. Adm'rs v. Schundler*, 49 A.3d 860 (N.J. 2012).  So while the DOL's position does not bind the Supreme Court or conclusively resolve the pending *Kennedy* appeal, the Court here cannot ignore the DOL's position or its potential impact on the *Kennedy* appeal.

NFI then argues that *Kennedy* was wrongly decided.  [Dkt. 278 at 28–30; Dkt. 293 at 8].  NFI states that the *Kennedy* court's conclusion undermines legislative intent as interpreted in

*Hargrove*.  [Dkt. 278 at 29].  In deciding to apply the UCL's ABC test to WPL claims, the

*Hargrove* court sought "to determine and effectuate the intent of the Legislature."  *Hargrove*,

106 A.3d at 456.  According to NFI, finding that the UCL's ABC test applies to WPL claims but

not the UCL's statutory exclusions "endorses the absurd proposition that the Legislature intended

the WPL to incorporate *some* of the UCL's guidance regarding employee status, but not all of it."

[Dkt. 278 at 29 (emphasis in original)].  NFI also disagrees with the *Kennedy* court's conclusion

that New Jersey's Legislature could have added the UCL's exclusions if it wanted these

exclusions to apply.  [Dkt. 293 at 8].  NFI states that

> [t]he problem with this argument is that the Legislature did not
> identify the ABC test as the test for determining employee status
> under the WPL.  Rather, the Supreme Court of New Jersey
> imported the ABC test from the UCL into the WPL through a court
> ruling [in *Hargrove*].  The Legislature thus had no occasion to state
> whether the exceptions to the ABC test apply in the context of the
> WPL.

[Dkt. 293 at 8].

These arguments expose flaws in NFI's reading of *Hargrove*, criticism of *Kennedy*,

interpretation of the WPL, and overall position.  As *Hargrove* observed, the purpose of the WPL

is "to protect an employee's wages and to assure timely and predictable payment." *Hargrove*,

106 A.3d at 463 (citations omitted); *see also Rosen*, 925 A.2d at 37 ("Although the Wage law

does not include a legislative statement of intent, its enactment leads to the conclusion that the

statute was designed to protect employees' wages and to guarantee receipt of the fruits of their

labor.").  The *Hargrove* court found that the ABC test served this legislative purpose better than

other available tests because it "provide[s] more predictability and may cast a wider net."  *Id.* at

464.  In other words, *Hargrove* favored the ABC test over other available options because it

would best serve the WPL's purposes by covering more workers more predictably.

NFI's insistence that *Hargrove* silently adopted the UCL's twenty-five exceptions does not comport with the *Hargrove* court's reasoning or interpretation of the WPL. There is no basis in *Hargrove*'s finding that the ABC test best protects workers under the WPL to conclude that *Hargrove* impliedly sought to exclude broad swaths of workers from the WPL's protections. Likewise, there is no basis to find that the *Hargrove* court believed that the Legislature intended for the UCL's twenty-five statutory exclusions to apply to WPL claims.

NFI's claim that the New Jersey Legislature "had no occasion to state whether the exceptions to the ABC test apply in the context of the WPL" ignores the WPL's history. Again, there is no dispute that the WPL does not include the twenty-five UCL exclusions or Exclusion X specifically. Earlier versions of the WPL excluded workers in certain industries, but the Legislature revised the statute such that "only independent contractors and subcontractors [are] entirely beyond its reach." *Kennedy*, 2021 WL 2774844, at *6. In other words, the Legislature previously considered whether certain categories of workers should be excluded from the WPL but decided that only independent contractors are excluded. Further, seven years have elapsed since the *Hargrove* decision without legislative intervention, and the DOL applied the ABC test to WPL claims before *Hargrove* formally ratified this approach. *See Hargrove*, 106 A.3d at 465; *see also N.J. Dep't of Lab. & Workforce Dev.*, No. GE-2, 2011 WL 487598, at (EFPS Feb. 4, 2011). Against this backdrop, NFI's claim that the legislature had "no occasion" to consider whether the UCL's exclusions should apply to WPL claims simply because the Legislature has not specifically and publicly addressed the issue is speculative at best.

Ultimately, "[i]t is not the function of this Court to 'rewrite a plainly-written enactment of the Legislature [ ]or presume that the Legislature intended something other than that expressed by way of the plain language.'" *DiProspero v. Penn*, 874 A.2d 1039, 1048 (N.J. 2005) (quoting

*O'Connell v. State*, 795 A.2d 857 (N.J. 2002)).  The New Jersey Legislature plainly excluded twenty-five categories of workers from the UCL's protections, but did not exclude the same categories of workers from the WPL.  Nothing in *Hargrove* suggests otherwise.  The Court therefore agrees with the *Kennedy* court's finding that the UCL's statutory exclusions do not apply to WPL claims.  The Court thus concludes Exclusion X does not bar Plaintiffs' WPL claims as a matter of law.

### B.  Merits of NFI's Defense

Even if Exclusion X could apply to Plaintiffs' WPL claims, it would not bar these claims because Plaintiffs do not meet Exclusion X's statutory criteria.  Again, Exclusion X applies to

> [s]ervices performed by operators of motor vehicles weighing 18,000 pounds or more, licensed for commercial use and used for the highway movement of motor freight, who own their equipment or who lease or finance the purchase of their equipment through an entity which is not owned or controlled directly or indirectly by the entity for which the services were performed and who were compensated by receiving a percentage of the gross revenue generated by the transportation move or by a schedule of payment based on the distance and weight of the transportation move;

N.J. Stat. Ann. § 43:21-19(i)(7)(X).  NFI has failed to identify record evidence showing that Plaintiffs were "compensated by receiving a percentage of the gross revenue generated by the transportation move or by a schedule of payment based on the distance and weight of the transportation move."[12]

---

[12] The Court interprets the "and" in this statute as conjunctive rather than disjunctive.  In New Jersey, courts may read the terms "and" and "or" interchangeably when public policy supports such a reading.  *State v. DeMarco*, 416 A.2d 949, 951 (N.J. Super. Ct. Law. Div. 1980) (citing *Howard v. Harwoods Restaurant Co.*, 135 A.2d 161 (N.J. 1957)).  The Court's research did not identify a policy statement pertaining to Exclusion X.  However, the UCL and WPL are both remedial statutes designed to protect workers' wages.  *Haley v. Bd. of Rev., Dep't of Lab.*, 246 A.3d 1255, 1260 (N.J. 2021) (quoting *McClain v. Bd. of Review*, 237 N.J. 445, 456, 206 A.3d 353 (N.J. 2019)); *Hargrove*, 106 A.3d at 457.  Construing "and" as conjunctive narrows

NFI does not contend that it paid Plaintiffs a "percentage of the gross revenue" generated by Plaintiffs' work but argues that it paid Plaintiffs according to the "distance and weight of the transportation move." As NFI recognizes, the ICOAs included payment schedules that determined the amount of money that Plaintiffs would earn. [Dkt. 278 at 17]. "NFI always paid a base amount per mile (for example, $0.92 per mile for all dispatched loads less than 1,000 miles pursuant to the 2010 agreement)" and paid additional wages for specific tasks and expenses "[d]epending on the period and the ICOA." [Dkt. 278 at 17]. NFI concedes that the ICOAs do not mention truck weight, but claims that the per-mile rates impliedly account for truck weight. NFI points to the 2010 ICOA[13] which indicates that NFI would calculate mileage using the "Rand McNally Milemaker 'Short Miles' computerized mileage guide." [Dkt. 194-14, 2010 ICOA Attachment A ¶1(a)]. NFI contends that calculating payment in this way necessarily considers a truck's weight.

NFI has not provided evidence to support this argument. Record evidence suggests that Rand McNally's Milemaker is a system for determining driving mileage that does not necessarily correspond with the mileage measured by a driver's odometer.[14] [*See, e.g.*, Dkt. 280-5, 7/23/2019 Bencosme Dep. 176:24–181:4 ("Would you agree … that … your reimbursable mileage is not the actual miles that you drive but a calculation using the method specified in the [ICOA]?"); *id.* 179:9–180:24 ("Q. But would you dispute that you signed a contract according to

---

Exclusion X's scope and guarantees wage security for more workers. Policy therefore requires the Court to interpret "and" as a conjunctive.

[13] The 2009 ICOA also refers to the Rand McNally mileage calculation system, [*see* Dkt. 190-13 Ex. A § 1], but the 2017 ICOA does not.

[14] Indeed, Plaintiffs complain that NFI compensated them for fewer miles than they actually drove. [*E.g.* Dkt. 280-12, 9/26/17 Paz Dep. 11:23–12:8].

which the method of calculation, the agreed-upon method of calculation was Rand McNally, not

the actual miles you drove? …  You never checked to see if what [NFI] said Rand McNally said

the miles were were [sic] were actually what Rand McNally said the miles were?"); Dkt. 280-10,

7/21/2017 Hernandez Dep. 95:4–97:6].  But NFI has not identified evidence in the record—and

the Court's independent review did not identify any evidence—suggesting that this mileage

calculation method has anything to do with the per-mile rate that NFI paid its drivers or whether

that rate contemplates a truck's weight.

NFI attempts to fill this evidentiary gap with argument.  NFI cites *Big Daddy Drayage v.*

*New Jersey Department of Labor and Workforce Development*, a DOL administrative decision

where an administrative law judge ("ALJ") found that the weight component of Exclusion X was

satisfied where the employer set wages "using a zip-code to zip-code rate calculated *taking into*

*consideration a standardized full-load container* is sufficient to meet the test."  2017 WL

10440445, at *15 (EFPS Dec. 11, 2017) (emphasis in original).  NFI argues that this finding

determined as a matter of law that the Rand McNally "payment mechanism satisfies the

requirement that owner-operators be paid based on the distance and weight of a move."  [Dkt.

293 at 5–6].

The Court disagrees.  In *Big Daddy Drayage*, the ALJ considered evidence demonstrating

that the employer "was not in the business of transporting small loads, big loads or loads in

between, but rather standardized shipping containers, i.e., 'weight' is not an independent variable

for its customer base."  2017 WL 10440445, at *14.  The ALJ considered evidence which

showed that a "standard container is a standard container - and it would be wasteful not to fill it

to the legal limit [the employer's] rate book treated a container as a container, and fundamentally

based compensation on the zip code of the recipient."  *Id.* *14.  It was only after considering this

evidence that the ALJ found that the motor carrier's per-mile rate included the weight of the shipments. The ALJ did not find as a matter of law that *all* per-mile shipping rates offered by *all* motor carriers necessarily contemplate the shipment's weight.

In contrast, NFI has not cited any record evidence suggesting that NFI developed its per-mile rates based factors similar to those considered in *Big Daddy Drayage*. NFI has not provided the Court with any record evidence demonstrating how NFI develops its per-mile rates.[15] At oral argument, NFI represented that it calculated its per-mile rates based on similar factors. But argument is no substitute for evidence at summary judgment. *See Matsushita*, 475 U.S. at 587. The ICOAs do not establish different per-mile rates for full trailers and empty trailers, and NFI did not argue or present evidence to suggest that NFI developed its per-mile rates by averaging the weight of full and empty trailers. So while it may be true that NFI calculates rates in the same manner as the motor carrier in *Big Daddy Drayage*, NFI has not offered evidence to support this conclusion.

The other forms of compensation included in the ICOAs do not cure this deficiency. As noted above, the ICOAs state that NFI would compensate its drivers for other tasks and expenses not connected to delivery weight or mileage. [*E.g.* Dkt. 190-14, 2010 ICOA Attachment A ¶ 2]. But Exclusion X considers compensation based only on "mileage and weight," and the Court cannot extend this plain language to include compensation based on other factors. *See Barows v.*

---

[15] *Cf. NFI Ranked in Transport Topics 2021 List of Top 50 Logistics Companies*, About NFI: News, https://www.nfiindustries.com/about-nfi/news/2021-top-50-logistics-companies/ (last visited April 4. 2022) ("NFI Top 50" hereinafter) ("NFI's brokerage solutions deliver truckload, less-than-truckload, small parcel, intermodal, and temperature-controlled transportation while its specialized brokerage capabilities include refrigerated, flatbed, over-dimensional, and more.").

*Chase Manhattan Mortg. Corp.*, 465 F. Supp. 2d 347, 362 (D.N.J. 2006) ("When the meaning of the statutory language is clear and unambiguous, the statute must be enforced as written.").

Thus, even if Exclusion X could apply as a matter of law, NFI has not identified any record evidence showing that it compensated its drivers based on "mileage and weight" and, therefore, that Exclusion X applies in this case.  Instead, the available evidence on this issue suggests only that Plaintiffs were compensated per mile as calculated using the Rand McNally system.  Exclusion X therefore does not preclude application of the ABC test.[16]

### ii.  ABC Test

Having confirmed that Exclusion X does not preclude Plaintiffs from brining their WPL claim, the Court returns to the primary issue of whether Plaintiffs are employees or independent contractors under New Jersey's ABC test.  New Jersey law presumes that workers are employees and places the burden on putative employers to show otherwise by satisfying all three elements of the ABC test: (A) the "control" test; (B) the "course of business" or "place of business" test; and (c) the "independent business" test.  *Echevarria*, 2016 WL 1047225, at *7.  Failure to satisfy any one of these elements means that the worker is an employee.  *Id.*

Plaintiffs argue that NFI cannot satisfy any of these elements based on record evidence and, therefore, Plaintiffs are entitled to summary judgment.  [*See* Dkt. 284 at 27].  NFI disagrees. NFI argues that the evidence shows that Plaintiffs were independent contractors under the ABC test.  [Dkt. 278 at 31].  NFI also argues that federal statute preempts Prong B of the ABC test. [Dkt. 278 at 45–47].  The parties brief Prong B of the ABC test first and the Court will review their arguments in the order presented.

---

[16] The Court finds that NFI has not provided evidence sufficient to prove Exclusion X as a matter of law or to create an issue of fact to survive summary judgment on this issue.

### A.  Prong B

Prong B asks whether the worker performed services "outside of the usual course of" the putative employer's business, and whether the services are performed "outside of all of the places of business of the enterprise for which such service[s] [are] performed."  *Hargrove*, 106 A.3d at 458 (quoting N.J. Stat. Ann. § 43:21–19(i)(6)).  A putative employer may satisfy Prong B "by a showing *either* that the services performed are outside the employer's usual course of business *or* that the service is performed outside of all of the employer's places of business."  *E. Bay Drywall, LLC v. Dep't of Lab. & Workforce Dev.*, 249 A.3d 872, 878 (N.J. Super. Ct. App. Div. 2021) (citations and quotations omitted) (emphasis added).

Plaintiffs contends that NFI cannot satisfy Prong B under either test.  [Dkt. 284 at 27–28]. In response, NFI states that it satisfies both tests of Prong B, [Dkt. 278 at 40–43], and NFI that if the Court agrees with Plaintiffs' view of Prong B, then the Federal Aviation Administration Authorization Act ("FAAAA") preempts Prong B altogether.  [Dkt. 278 at 45–47].  The Court will first review Prong B's "course of business" and "place of business" tests, then consider NFI's preemption argument.

### 1.  Course of Business

NFI argues that the work Plaintiffs performed was outside of NFI's "course of business," which was merely to connect NFI's clients with independent contractors.  [Dkt. 278 at 40].  In other words, NFI claims that it provided logistics services, not shipping or delivery services, and that Plaintiffs' work of transporting goods from warehouses to stores was "outside of" these logistics services.

To support this argument, NFI relies on *Trauma Nurses, Inc. v. Board of Review, New Jersey Department of Labor*, where the New Jersey Superior Court, Appellate Division found

24

that nurses were not employees of a staffing company that matched nurses with hospital clients. 576 A.2d 285, 291–92 (N.J. Super. Ct. App. Div. 1990). In that case, the staffing agency contracted with hospitals that wished to hire temporary hospital personnel, including nurses. *Id.* at 288. The nurses contracted with the staffing agency to be eligible for placement in one of the agency's client hospitals, but did not provide any nursing care at the agency or on behalf of the agency. *See id.* at 287, 292. When considering Prong B's "course of business" test, the Superior Court found that the staffing company did not provide "health care services," unlike the nurses with whom the agency contracted. *Id.* at 292. The Superior Court ruled in favor of the staffing agency on this issue, concluding that the nurses were outside of the staffing company's course of business because the company "does not perform patient care. It brokers nurses." *Id.* at 291–92. NFI argues that the same logic applies here.

NFI's argument misses the mark. It is undisputed that NFI hired drivers as employees in addition to contracting with owner-operator drivers. [Dkt. 276, NFI Opp. to Pls' SUMF ¶ 13]. This fact alone distinguishes this case from *Trauma Nurses*. NFI also advertises that it provides "dedicated transportation services" as well as "freight brokerage" and logistics services. *See* NFI Top 50, *supra*. NFI maintained a dispatch team to coordinate deliveries to NFI's clients, and record evidence demonstrates that Plaintiffs coordinated primarily with NFI—not NFI's clients—to complete their work. [*See, e.g.*, Dkt. 190-10, Jucknik Dep. 22:6-23:19 (testifying that drivers were required to report to NFI when they arrived at and departed from Trader Joe's stores, even though this was a "customer requirement"]. NFI did not just connect its clients with drivers but used personnel and infrastructure to facilitate the delivery services that NFI provided to its clients. *Cf. Trauma Nurses*, 576 A.2d at 287–88 (noting that the staffing agency matched a

nurse's preferences and availability and acted as a "conduit" for payment but was not involved in the nurses' performance of their work).

Ultimately, the undisputed evidence demonstrates that the delivery services that Plaintiffs performed for NFI were part of NFI's "course of business," even if NFI also provided logistics services to its clients.  NFI therefore does not satisfy Prong B's "course of business" test.

### 2.   Place of Business

The Court's analysis of the "place of business" test begins with *Carpet Remnant Warehouse, Inc. v. New Jersey Department of Labor*.  593 A.2d 1177 (N.J. 1991).  In that case, a carpet retailer hired workers to install carpet in its customers' homes and businesses.  *Id.* at 1180–81.  The workers picked up each customer's carpet from the retailer's warehouse on the day of installation, transported the carpet to the customer's home or business, and installed the carpet.  *Id.* at 1181.  After an investigation, the DOL determined that the carpet installers were employees rather than independent contractors under the ABC test, believed that the retailer violated the UCL by failing to contribute to New Jersey's unemployment fund, and sought to recoup the missing funds.  *Id.* at 1180.  In an administrative proceeding, an ALJ applied the ABC test, found that "the retailer's places of business may broadly be said to extend to every geographical point of installation" and concluded that the retailer failed on Prong B.  *Id.* at 1190 (citations and quotations omitted).

The Supreme Court of New Jersey rejected the ALJ's interpretation of the "place of business" test and the ALJ's conclusion.  The Supreme Court found that extending the carpet retailer's "places of business" to every point of installation would make it "practically impossible" for the retailer to satisfy this factor of Prong B.  *Id.*  The Supreme Court determined that "place of business" "refers only to those locations where the enterprise has a physical plant

or conducts an integral part of its business." *Id.* The Supreme Court concluded that the points of installation were not physical plants or locations where the retailer conducted an "integral part of its business" and therefore that the retailer satisfied the place of business test.

NFI contends that it passes the "place of business" test under *Carpet Remnant Warehouse*. NFI argues that Plaintiffs did not perform any work at any of NFI's "physical plants" because NFI does not own the Warehouses where Plaintiffs picked up their loads or the Trader Joe's stores where Plaintiffs delivered the loads. [Dkt. 278 at 40–41]. NFI also claims that NFI did not conduct an "integral part of its business" at the Nazareth or Hatfield Warehouses because the deliveries from those Warehouses account for only 12% and 3% of NFI's revenues, respectively. [*Id.* at 41 n.11].

As Plaintiffs point out, the Court previously defined NFI's places of business to "include both their own factories as well as the Trader Joe's locations that the drivers delivered to" in its opinion on class certification. *Portillo v. Nat'l Freight, Inc.*, 336 F.R.D. 85, 95 (D.N.J. 2020). The Court defined the "place of business" test in this manner when determining whether common questions of law or fact "predominate" over questions affecting individual members for the purposes of Federal Rule of Civil Procedure 23(b)(3). *Id.* at 93–95. To derive this definition, the Court relied on *Morales v. V.M. Trucking, LLC*, where the New Jersey Superior Court, Appellate Division found that a motor carrier like NFI operated "at no fixed place, ... the places of defendants' business enterprise not only included its facility, but also extended to the various locations the truck drivers … were required to travel to perform services on defendants' behalf." *Portillo*, 336 F.R.D. at 95 (quoting *Morales*, Docket No. A-2898-16T4, 2019 WL 2932649, at *6 (N.J. Super. App. Div. July 9, 2019)). Applying *Morales*, the Court found that common

questions of fact predominated and that "Prong B can be resolved on common evidence" because Plaintiffs all reported to the Warehouses and Trader Joe's retail stores. *Id.* at 95.

NFI asks the Court to reconsider this prior interpretation of Prong B because Plaintiffs only "worked on the road and at Trader Joe's locations." [Dkt. 278 at 41]. NFI contends that the Court should not have relied, and should not rely now, on *Morales* because *Morales* is an unpublished appeals court decision that is not binding on this Court. [Dkt. 278 at 42]. But as noted above, federal courts may rely on unpublished state court opinions as persuasive authority, even the opinions do not bind federal courts. *Kerrigan*, 560 F. App'x at 166 n.4.

 NFI also states that the Supreme Court of New Jersey in *Carpet Remnant Warehouse* "trumps (if not outright prohibits)" *Morales* and the Court's prior application of *Morales*. [Dkt. 278 at 43]. The Court disagrees because this case, like *Morales*, is distinguishable from *Carpet Remnant Warehouse* in two respects. First, unlike the retailer in *Carpet Remnant Warehouse*, which owned a retail carpet store and offered installation as an add-on service, *see Carpet Remnant Warehouse*, 593 A.2d at 1180, NFI does not sell goods to its customers and offer an optional delivery service. Rather, delivery *is* the service that NFI provides customers.[17] In other words, where NFI "conducts business" necessarily extends beyond the walls of its own facilities. Second, there is no dispute that Plaintiffs and other NFI drivers delivered goods from the Warehouses to the same Trader Joe's retail locations. *Carpet Remnant Warehouse* does not indicate that its carpet installers repeated services for the same clients. Thus, unlike the workers in *Carpet Remnant Warehouse*, who apparently performed one-off jobs for residential and commercial customers, Plaintiffs repeatedly delivered to the same locations for the same client.

---

[17] To find that NFI only conducts integral parts of its business in its corporate headquarters would effectively collapse the "physical plant" and "integral part of business" components of the place of business test.

Plaintiffs "performed services" at these stores because they drove goods to these stores and physically unloaded these goods from their trailers onto the stores' premises.  [Dkt. 280-2, Motzer Decl. ¶ 16].[18]

Even if NFI did not conduct an "integral part of its business" at the Trader Joes stores where NFI's drivers routinely delivered goods, NFI did conduct an "integral part of its business" at the Hatfield and Nazareth Warehouse Offices and Plaintiffs performed services at these Warehouses Offices.  Although NFI did not own the Hatfield or Nazareth Warehouses, it maintained an office within the Hatfield Warehouse and an office trailer in the parking lot of the Nazareth Warehouse.  [Dkt. 280-2, Motzer Decl. ¶ 8].  Most if not all face-to-face interactions between Plaintiffs and NFI occurred at these Warehouse Offices.  [*E.g.* Dkt. 280-7, 7/8/2019 Castaneda Dep. 150:5–7 (testifying that he had never visited NFI's headquarters); Dkt. 190-6 at 31, 9/26/2017 Paz Dep. 85:2–4 (same)].  NFI staffed these offices with managers and coordinators who performed essential business functions.  [Dkt. 280-2, Motzer Decl. ¶¶ 6–8]. These managers and coordinators communicated with Plaintiffs before and after every shift about the loads and routes that Plaintiffs would drive that day.  [Dkt. 280-2, Motzer Decl. ¶¶ 10, 22].  These NFI office personnel also distributed and collected paperwork from Plaintiffs before and after each delivery.  [*E.g.* Dkt. 280-7 at 11, 7/8/2019 Castaneda Dep. 144:19–22; Dkt. 190-9 at 22, 7/12/2017 Edin Vargas Dep. 84:10–23; Dkt. 190-8 at 14, 6/2/2017 Suarez Dep. 50:12–23]. NFI onboarded drivers at these Warehouse Offices, as several Plaintiffs signed their ICOAs at

---

[18] The Court also rejects NFI's argument that the Hatfield and Nazareth warehouses were not an "integral part" of NFI's business because of the percentage of NFI's revenues that resulted from NFI's work at these warehouses.  *See Martin v. Selker Bros.*, 949 F.2d 1286, 1295 (3d Cir. 1991) (observing that the analogous test applied to Fair Labor Standards Act claims considers whether workers "perform the primary work of the alleged employer" in a location, and not the "amount of work" performed (quoting *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1385 (3d Cir. 1985))).

the Warehouse offices.  [*E.g.* Dkt. 190-9 at 10, 7/12/2017 Edin Vargas Dep. 33:1-12; 37:1–3;

Dkt. 280-8, 9/15/2017 Duran Dep. 55:14-20; Dkt. 280-4, 7/27/2017 Bencosme Dep. 41:23–25].

At bottom, NFI's Warehouse Offices and the employees who staffed those offices were the face

of NFI for Plaintiffs.

NFI drivers completed tasks at and around the Warehouse Offices that formed a critical

part of the services that NFI provided to Trader Joes.  Plaintiffs reported to the Warehouse

Offices before every shift.  *Compare William H. Goldberg & Co. v. Div. of Emp. Sec., Dep't of*

*Lab. & Indus.*, 121 A.2d 12, 16 (N.J. 1956) (finding that an insurance company did not satisfy

the "place of business" test where an insurance solicitor "reported daily" to the company's

office) *with Walfish v. Nw. Mut. Life Ins. Co.*, No. 2:16-CV-4981 (WJM), 2019 WL 1987013, at

*8 (D.N.J. May 6, 2019) (finding Prong B satisfied in part because the plaintiff did not "regularly

report[]" to the putative employer's offices).  There, Plaintiffs received information about the

deliveries and routes for which Plaintiffs were responsible that day.  [*E.g.* Dkt. 280-11 at 4,

8/2/2019 Hernandez Dep. 10:19–22].  Some Plaintiffs also fueled their trucks at NFI's on-site

facilities so that they would not have to leave the road to stop for fuel.  [*E.g.* Dkt. 190-6,

9/26/2017 Paz Dep. 63:3–7; Dkt. 190-9, 8/1/2019 Vargas Dep. 12:2–6; 15–20; Dkt. 280-11,

8/2/2019 Hernandez Dep. 25:1–26:11].  After learning which trailer Plaintiffs were responsible

for transporting, Plaintiffs inspected that trailer.  [*See* Dkt. 276, NFI Opp. to Pls' SUMF ¶ 19].

Most importantly, after learning which trailer Plaintiffs were responsible for transporting,

Plaintiffs attached the trailer to their trucks.  [Dkt. 280-2, Motzer Decl. ¶ 10].  Occasionally,

when Plaintiffs retrieved return items such as pallets and milk crates, from the Trader Joe's

stores, Plaintiffs returned these items to the Warehouses.  [Dkt. 280-2, Motzer Decl. ¶ 19].  All

of these tasks are necessary components of the transportation services that NFI provided to Trader Joe's.

At bottom, the undisputed facts show that Plaintiffs performed services in physical locations where NFI conducted an "integral part" of its business.

### 3.   FAAAA Preemption

Congress passed the Motor Carrier Act of 1980, 94 Stat. 793, to "deregulate" the interstate truck shipping industry by replacing a patchwork of state regulations with a federal regime.  *See Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 368 (2008).  In 1994, Congress added to this federal regime by passing the FAAAA to preempt state trucking regulations.  *Id.*  The FAAAA's preemption clause states that "a State … may not enact or enforce a law, regulation, or other provision … related to a price, route, or service of any motor carrier … with respect to the transportation of property."  49 U.S.C.A. § 14501(c)(1); *Rowe*, 552 U.S. at 368.

NFI argues that, if the Court determines that NFI fails Prong B's "course of business" and "place of business" tests, then the FAAAA preempts Prong B altogether.  [Dkt. 278 at 45–47]. According to NFI, an adverse finding on Prong B here would mean that Prong B necessarily requires NFI—and other motor carriers that use the same business model—to use employees rather than independent contractors, [Dkt. 293 at 12], and that such a requirement would affect the "price, route, or service" of NFI's transportation services.  [Dkt. 278 at 45–47].

To fully consider NFI's position, the Court must first review First and Third Circuit decisions that address this issue.  In *Schwann v. FedEx Ground Package Systems, Inc.,* the First Circuit found that the FAAAA preempts prong 2 of a three-part test that Massachusetts uses to distinguish employees from independent contractors. 813 F.3d 429, 432 (1st Cir. 2016).

*Schwann* concerned whether certain FedEx delivery drivers were employees or contractors under the Massachusetts Independent Contractor Statute, which applies a three-part test like New Jersey's. *Id.* at 432–33. But unlike Prong B of New Jersey's ABC test, prong 2 of Massachusetts' test only includes a "course of business" test and does not include a "place of business" test. *Id.* at 433 (quoting Mass. Gen. Laws ch. 149, §§ 148B(a)).

The district court found that the FAAAA preempted prong 2 of the Massachusetts test as applied to the workers who provided pickup and delivery services for FedEx. *Id.* at 435. According to the district court, finding otherwise would "proscrib[e]" FedEx's business model of using contractors to perform pickup and delivery services because those services are part of FedEx's "course of business." *Id.* The district court then found that upending FedEx's business model would logically affect "prices, routes, and services," and trigger FAAAA preemption. *Id.*

The First Circuit upheld the district court's reasoning and conclusion. The First Circuit observed that FAAAA preemption can occur where a state statute has a "potential" "logical" impact on prices, routes, and services, even if that effect is "indirect." *Id.* at 437 (citations and quotations omitted). Applying this standard, the First Circuit agreed with the district court that applying prong 2 in that case would "foreclose" FedEx's business model and require FedEx to hire employees rather than contractors. *See id.* at 438–39. Doing so would "logically be expected" to affect FedEx's routes and prices. *Id.*

The First Circuit also observed that Massachusetts law is an "anomaly because it makes any person who performs a service within the usual course of the enterprise's business an employee for state wage law purposes." *Id.* at 438. When applied to FedEx, prong 2 would "require[] FedEx to use persons who are employees to perform … pick-up and delivery services even if those persons could be deemed independent contractors under federal law and the law of

many states." *Id.* Thus, enforcing prong 2 against FedEx would disrupt the uniformity that the FAAAA sought to establish. *Id.* at 438. The Court concluded that the FAAAA preempted prong 2 of Massachusetts' three-part test as applied to certain FedEx delivery drivers.

The Third Circuit conducted a different analysis and reached a different conclusion when determining whether the FAAAA preempts New Jersey's ABC test as applied to a motor carrier. In *Bedoya v. American Eagle Express, Inc.*, the Third Circuit held "that New Jersey's ABC classification test is not preempted [by the FAAAA]." 914 F.3d 812, 824 (3d Cir. 2019). Plaintiffs in *Bedoya* were drivers for the defendant which was a "logistics company that provides delivery services to various medical organizations." *Id.* at 815–16. Plaintiffs sued under the WPL and New Jersey's Wage and Hour Law ("WHL"), N.J. Stat. Ann. §§ 34:11-56a et seq., alleging that they were misclassified as independent contractors. *Id.* at 815–16. The defendant moved for judgment on the pleadings, arguing that the FAAAA preempted the ABC test that applied to the drivers' WPL and WHL claims. *Id.* at 816. The district court found no preemption and denied the motion. *Id.*

The Third Circuit upheld the district court's decision. The Third Circuit observed that FAAAA preemption occurs where a state law has a "direct" and "significant" effect on the "price, route, or service" of interstate transportation. *Id.* at 823. To assess the "directness" of a state law's effect on prices routes, or services, *Bedoya* considered "whether the law: (1) mentions a carrier's prices, routes, or services; (2) specifically targets carriers as opposed to all businesses; and (3) addresses the carrier-customer relationship rather than non-customer-carrier relationships (e.g., carrier-employee)." *Id.* at 823. With respect to the "significance" of a state law's impact on prices, routes, or services, the court considered whether

> (1) the law binds a carrier to provide or not provide a particular
> price, route, or service; (2) the carrier has various avenues to

33

comply with the law; (3) the law creates a patchwork of regulation that erects barriers to entry, imposes tariffs, or restricts the goods a carrier is permitted to transport; and (4) the law existed in one of the jurisdictions Congress determined lacked laws that regulate intrastate prices, routes, or services and thus, by implication, is a law Congress found not to interfere with the FAAAA's deregulatory goal.

*Id.*[19]

Applying these factors, the Third Circuit concluded that the FAAAA does not preempt New Jersey's ABC test. The *Bedoya* court first concluded that this test's effect on "prices, routes, or services is tenuous" rather than direct. *Id.* at 824. The court found that the ABC test applies to putative employers in all industries and does not "single out carriers" or "mention carrier prices, routes, or services."[20] *Id.* The court also found that the ABC test does not "directly regulate how a carrier's service is performed," but merely "dictate[s] how a carrier behaves as an employer." *Id.* (cleaned up) (citations and quotations omitted). As such, the ABC test is "steps removed from regulating customer-carrier interactions through prices, routes, or services." *Id.* (citations and quotations omitted).

The *Bedoya* court also found that any "effect" of the ABC test on prices, routes, or services was not "significant." Here the Third Circuit distinguished New Jersey's ABC test from the three-part Massachusetts test analyzed in *Schwann*. The court reasoned that New Jersey's ABC test "does not bind [motor carriers] to a particular method of providing services" because motor carriers can satisfy Prong B by meeting the "course of business" or "place of business"

---

[19] By contrast, the *Schwann* court did not break down the directness or significance factors into subfactors to decide the FAAAA preemption issue. *See Schwann*, 813 F.3d at 437–41.

[20] *Cf. Schwann*, 813 F.3d at 437–38 ("[W]e observe the directly referential relationship between Plaintiffs' application of Prong 2 and FedEx's motor carrier services. … The text of Prong 2 as applied in this way thus expressly references FedEx's motor carrier services." (citations and quotations omitted)).

tests. *Id.* at 824–25. Thus, unlike the Massachusetts law at issue in *Schwann*, New Jersey's test provides "various options to comply with New Jersey employment law" and therefore does not "categorically prevent[] carriers from using independent contractors." *Id.* The Court also found that the three other sub-factors for assessing the "significance" of the ABC test's impact on the FAAAA weighed against preemption. *Id.* at 824–26. Because the ABC test only tenuously and insignificantly affects prices, routes, or services, the Third Circuit concluded that the FAAAA does not preempt New Jersey's ABC test. *Id.* at 826.

According to NFI, *Bedoya* requires the Court to reach the opposite conclusion in this case with respect to Prong B. [Dkt. 293 at 13]. NFI argues that, if the Court here finds that NFI's "places of business" include the locations where its drivers pick up and deliver goods, then the Court will effectively rule that NFI cannot satisfy the "place of business" test. [*See* Dkt. 278 at 46–47]. NFI argues that such a result would place NFI in the same position as FedEx in *Schwann*.

According to NFI, the potential to satisfy the "place of business" test as an alternative to the "course of business" test is the "only reason" that *Bedoya* distinguished itself from *Schwann* and "held the FAAAA does not preempt New Jersey's Prong B." [Dkt. 278 at 46]. For NFI, a ruling that NFI cannot satisfy the "place of business" test would change this variable in the *Bedoya* court's reasoning. Such a ruling would effectively preclude NFI from satisfying Prong B, and undermine *Bedoya*'s finding that Prong B is not preempted because it does not "require[] carriers to use employees rather than independent contractors." [Dkt. 293 at 12 (quoting *Bedoya*, 914 F.3d at 825)]. NFI believes that the inverse of this conclusion from *Bedoya* applies here: if Prong B "requires carriers to use employees rather than independent contractors," then the FAAAA preempts Prong B. [Dkt. 293 at 12–13]. NFI concludes that an adverse finding on

Prong B's "place of business" test would require NFI to use employees and subject Prong B to

FAAAA preemption.  [Dkt. 278 at 46–47].

The Court declines NFI's invitation to overrule *Bedoya*.  Despite NFI's effort to construe

*Bedoya*'s reasoning in its favor, the Court sees no room in *Bedoya*'s broad holding that "New

Jersey's ABC classification test is not preempted [by the FAAAA]" to find that the FAAAA

preempts Prong B of this test under certain circumstances.  *Bedoya*, 914 F.3d at 824.  Nothing in

*Bedoya* suggests that this categorical holding depends on a particular interpretation of Prong B or

Prong B's application to a particular set of facts.  Moreover, the *Bedoya* court reached its

conclusion in a case concerning drivers for a motor carrier, just like this one, so there is no

discernible basis to distinguish this case from *Bedoya* factually.

NFI also overstates Prong B's significance to the *Bedoya* court's reasoning and the extent

to which the *Bedoya* court's Prong B analysis entitles NFI to relief.  In doing so, NFI reduces

significant analytic distinctions between *Bedoya* and *Schwan* to a distinction between New

Jersey and Massachusetts law.  *Bedoya* considered two primary factors to determine whether the

FAAAA preempts a state law: "the directness of a law's effect on prices, routes, or services;"

and the "significance" of the law's effect on "prices, routes, or services."  *See Bedoya*, 914 F.3d

at 822–23.  When *Bedoya* analyzed the "directness" factor and found that it weighed against

preemption, it did not analyze Prong B.[21]  *Id.* at 24.  *Bedoya* only discussed the importance of

having two ways to satisfy Prong B in its analysis of whether the ABC test's effect on "prices,

routes, or services" was "significant."  *Id.* at 824.  But whether "a carrier has various avenues to

comply with the law" is just one of four sub-factors that the *Bedoya* court considered when

---

[21] By contrast, the *Schwann* court found a "directly referential relationship between Plaintiffs'
application of Prong 2 and FedEx's motor carrier services."  *Schwann*, 813 F.3d at 437.

determining whether New Jersey's ABC test's effect on "prices, routes, or services" was "significant."[22]  *See id.* at 823.  Prong B played no part in *Bedoya*'s conclusion that the ABC test's potential financial impact on an employer "does not equate to a significant impact on Congress' goal of deregulation."  *Id.* at 825–26.  The court also determined that finding no FAAAA preemption would not result in a "patchwork" of state legislation because New Jersey's ABC test is "similar to that used in many other states."  *Id.* at 826 (citations and quotations omitted).  This finding, like the court's broader holding, did not hinge on any particular interpretation of Prong B.  Thus, when NFI states that the two methods of satisfying Prong B provide "the only reason [*Bedoya*] held that the FAAAA does not preempt New Jersey's Prong B," it inflates Prong B's role in the *Bedoya* court's reasoning.

NFI also misinterprets *Bedoya* when it argues that classifying a worker as an employee rather than an independent contractor affects "prices, routes, services" and results in FAAAA preemption.  *Bedoya* found the opposite.  When considering the "significance" factor, *Bedoya* observed that a worker's classification under the ABC test does not necessarily prove anything about the ABC test's effect on "prices, routes, or services."  The motor carrier in *Bedoya* argued that "applying the New Jersey law may require it to shift its model away from using independent contractors, which will increase its costs, and in turn, its prices."  *Id.* at 825.  The motor carrier

---

[22] *Bedoya*, 914 F.3d at 823 ("To assess whether a law has a significant effect on a carrier's prices, routes, or services, courts should consider whether: (1) the law binds a carrier to provide or not provide a particular price, route, or service; (2) the carrier has various avenues to comply with the law; (3) the law creates a patchwork of regulation that erects barriers to entry, imposes tariffs, or restricts the goods a carrier is permitted to transport; and (4) the law existed in one of the jurisdictions Congress determined lacked laws that regulate intrastate prices, routes, or services and thus, by implication, is a law Congress found not to interfere with the FAAAA's deregulatory goal.").

listed new costs that would arise if drivers were found to be employees rather than contractors.[23]
The *Bedoya* court rejected this argument as conclusory, finding that the motor carrier failed to
"provide even a logical connection between the application of New Jersey's ABC classification
test and the list of new costs it would purportedly incur." *Bedoya*, 914 F.3d at 824.  In other
words, a determination that a driver is an employee under the ABC test does not, without more,
establish a logical connection between the driver's classification as an employee and an effect on
"prices, routes, or services." [24]

---

[23] *Bedoya*, 914 F.3d at 825 ("AEX asserts that if it can no longer use independent contractors to
perform its delivery services, then it will be forced to recruit employees, bring on a human
resources department to manage them, acquire and maintain a fleet of vehicles and pay expense
reimbursements, provide fringe benefits, plan and dictate delivery routes and timing, and pay
overtime wages and employment taxes," all of which would affect prices.).

[24] The analysis and conclusion discussed in this paragraph underscore two additional differences
between *Bedoya* and *Schwann* that have nothing to do with Prong B.  First, the *Bedoya* court
applied a more exacting analysis than the *Schwann* court when determining whether a "logical"
connection was established between a state law and "prices, routes, or services."  The *Schwann*
court appears to have accepted—without analysis or explanation—that hiring employees rather
than contractors would necessarily affect FedEx's finances.  *See, e.g.*, *Schwann*, 813 F.3d at 438
("As this case shows, [the decision to hire employees or contractors] implicates the way in which
a company chooses to allocate its resources…").  From there, the *Schwann* court appears to have
simply accepted that any impact on FedEx's finances would necessarily affect prices.  *See id.*
But as noted above, the *Bedoya* court rejected a more detailed argument as conclusory.  *Bedoya*,
914 F.3d at 824.  So while both courts only required a "logical" rather than empirical connection
between state law and "prices, routes, or services," the *Bedoya* court required a more robust and
better explicated logical connection than the *Schwann* court.

Second, the *Bedoya* and *Schwann* courts fundamentally disagreed about the propriety of judicial
decisions that upend established business practices.  The *Schwann* court feared that, if it refused
to find that the FAAAA preempted Massachusetts law, "a court, rather than the market
participant, would ultimately determine what services that company provides and how it chooses
to provide them." *Scwhann*, 813 F.3d at 438.  *Bedoya* had no such reservations.  *See Bedoya*,
914 F.3d at 825–26 (accepting that "disruption of a labor model … could have negative financial
and other consequences for an employer" but concluding that the FAAAA was not "meant to
exempt workers from receiving proper wages, even if the wage laws had an incidental impact on
carrier prices, routes, or services.").

38

Thus, even if NFI is correct that the Court's application of the ABC test here requires NFI to hire employees rather than contractors, and that this fact alone permits the Court to reach a different conclusion from *Bedoya*, NFI wrongly assumes that FAAAA preemption would follow. Under *Bedoya*, NFI would still have to show that a shock to its business model "significantly" affects "prices, routes, or services" to establish FAAAA preemption, rather than argue such an effect in a conclusory manner. *See Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 136–37 (3d Cir. 2018) (discussing *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1055–57 (7th Cir. 2016)). And like the motor carrier in *Bedoya*, NFI fails to demonstrate that the Court's interpretation of Prong B above will have any effect on "prices, routes, or services," even if this interpretation means that Plaintiffs are employees rather than independent contractors. NFI's conclusory argument on this point does not identify a single cost that it would incur if Plaintiffs are deemed to be employees under the ABC test.[25] Nor does NFI explain how new costs would "significantly" affect "prices, routes, or services," particularly where NFI already hires "company drivers" as employees. *See Phillips v. Roadrunner Intermodal Servs.*, No. 216CV01072SVWMRW, 2016 WL 9185401, at *6 (C.D. Cal. Aug. 16, 2016) ("[T]he Defendants have not shown that reclassifying drivers would have a significant effect on their business. [Defendants] already utilizes both owner-operators … and company drivers, who are

---

As this discussion demonstrates, the difference between *Bedoya* and *Schwann* cannot be reduced to the difference between Prong B of New Jersey's ABC test and prong 2 of Massachusetts' test.

[25] [*See* Dkt. 278 at 45–46 ("Notably, unlike New Jersey, the second element of Massachusetts' test for employee status does not have an alternative option, i.e., it requires all independent contractors to perform the services outside a company's usual course of business. Per the First Circuit, such a requirement forces motor carriers to us e employees rather than independent contractors and thereby relates to the prices, routes, or services of motor carriers.")]. NFI's argument lacks the detail and specificity that the *Bedoya* court rejected as conclusory. *See Bedoya*, 914 F.3d at 825.

certified drivers that do not have or do not wish to lease a truck to the company and are classified as employees."). Thus, even if the Court agreed that its interpretation of Prong B permitted the Court to revisit *Bedoya*'s holding based on *Bedoya*'s reasoning, the Court disagrees with NFI that *Bedoya*'s reasoning requires the Court to find that the FAAAA preempts Prong B.

In sum, the Court rejects NFI's argument that the FAAAA preempts Prong B of New Jersey's ABC test. Because the undisputed facts show that NFI cannot satisfy Prong B, and because NFI's preemption argument fails, the Court need not consider Prongs A or C to conclude that Plaintiffs were NFI employees under New Jersey's ABC test.

### b. Truth-In-Leasing Preemption

NFI next argues that federal Truth in Leasing ("TIL") regulations, 49 C.F.R. § 376.1 et seq., preempt Plaintiffs' WPL claims altogether. [Dkt. 278 at 47]. Plaintiffs allege that NFI violated the WPL by unlawfully requiring Plaintiffs to pay certain expenses and deducting funds from Plaintiffs' paychecks to cover those expenses. There is no dispute that the ICOAs contemplated and/or authorized these expenses and deductions. NFI argues that TIL regulations authorized NFI to contractually allocate costs to drivers and to deduct costs from the drivers' paychecks. [Dkt. 278 at 48–49 (citing 49 C.F.R. §§ 376.12(e), (j)(1), (j)(3), (h))]. NFI argues that TIL regulations preempt the WPL to the extent the WPL prohibits these allocations and deductions.

"The Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, invalidates state law that 'interferes with or is contrary to federal law.'" *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)). Federal regulations can preempt state laws in the same manner as federal statutes. *Id.* (citing *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)). Federal law can "preempt state

law through express preemption, implied conflict preemption, and field preemption." *Cohen v. Subaru of Am., Inc.*, No. 120CV08442JHRAMD, 2022 WL 721307, at *37 (D.N.J. Mar. 10, 2022) (citing *Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 239–41 (3d Cir. 2009), *aff'd sub nom. Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011)).  "A federal enactment expressly preempts state law if it contains language so requiring." *Brusewitz*, 561 F.3d at 239 (citing *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001)).  Implied conflict preemption arises where it is "impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (citations and quotations omitted).  Field preemption applies where a federal regulatory scheme is "sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation," or where "the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Farina*, 625 F.3d at 121 (3d Cir. 2010) (quoting *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).

The Court finds that the TIL regulations do not preempt Plaintiffs' WPL claims.  Express preemption does not apply because "no text of the [TIL] regulation expressly preempts state laws; indeed, nothing in the regulations (or governing federal statute) mentions preemption." *Goyal v. CSX Intermodal Terminals, Inc.*, No. 17-CV-06081-EMC, 2018 WL 4649829, at *3 (N.D. Cal. Sept. 25, 2018) (citations omitted).  Likewise, "[t]here is no indication that Congress intended federal regulations to preempt the entire field," so field preemption does not apply. *Id.* (citations omitted).

Finally, conflict preemption does not apply because the WPL does not make compliance with TIL regulations impossible or frustrate Congress's objectives when passing TIL regulations. TIL regulations do not, as NFI argues, authorize deductions or reallocation of expenses.  Instead, TIL regulations only require "that the deductions and allocation of expenses be specified and disclosed in the lease" between the motor carrier and the driver if the parties to the lease agree to deduct and reallocate funds.  *Id.*; *see also, e.g.*, 49 C.F.R. § 376.12(j)(1) ("The lease **shall clearly specify** the legal obligations of the authorized carrier to maintain insurance coverage….") (emphasis added); *id.* § 376.12(e) ("The lease **shall clearly specify** the responsibility for each party with respect to the cost of fuel, fuel taxes….") (emphasis added); *Renteria v. K&R Transp., Inc.*, No. 98 CV 290 MRP, 1999 WL 33268638, at *3 (C.D. Cal. Feb. 23, 1999) ("The aim of the [TIL] regulations is to compel disclosure of the contract terms between the owner-operators and the carriers, not to govern the terms for which the parties are permitted to bargain.").  The WPL, on the other hand, generally prohibits deductions and cost allocations regardless of whether the parties specify those deductions or allocations in a contract.  *See* N.J. Stat. Ann. § 34:11-4.4.  In other words, an employer can violate the WPL by withholding funds from an employee, and simultaneously comply with TIL regulations by disclosing the basis for the withholding in a contract.  The WPL therefore "does not interfere with the TIL regulations' purpose of ensuring disclosure" or prevent compliance with TIL regulations.  *Alvarez v. XPO Logistics Cartage LLC*, No. CV 18-03736 SJO (E), 2018 WL 6271965, at *7 (C.D. Cal. Nov. 15, 2018), *order vacated on reconsideration sub nom. Omar Alvarez v. XPO Logistics Cartage, LLC*, No. 2:18-CV-03736-RGK-E, 2021 WL 4057249 (C.D. Cal. June 24, 2021).  As a result, TIL regulations do not preempt the WPL.

**c. Plaintiffs Who Signed Releases**

NFI seeks summary judgment as to the twenty Plaintiffs who signed a Release that NFI

offered to drivers in the Summer of 2018 in exchange for $6,000 when NFI terminated its

contractual relationships with some drivers as part of a workforce reduction.  The Release states,

in part:

> **General Release by Contractor.**    In consideration of the Bonus
> Amount described in Paragraph 1 of this Agreement, you release
> and discharge NFI from any and all legally waivable charges,
> complaints, claims, liabilities obligations, promises, agreements,
> controversies, damages, actions, causes of action, suits, rights
> demands, costs, losses, debts and expenses … of any nature
> whatsoever, known or unknown, in law or equity.  Without
> limiting the foregoing general release, you understand that this
> general release applies to, but is not limited to:
>
> …
>
> (d)     All claims arising out of a claim or allegation that you were
> misclassified as an independent contractor and should have been
> classified as an employee, including but not limited to claim
> arising from any alleged violation by the Releasees of any federal,
> state, or local statutes, or ordinances, including, but not limited to:
> … the New Jersey Wage Payment laws….

[Dkt. 280-2 at 10–11].  NFI argues that the Release bars the twenty Plaintiffs who signed the

Release from bringing WPL claims against NFI.  [Dkt. 278 at 54].

Plaintiffs contend that the Release is invalid under the WPL and therefore does not defeat

the WPL claims of drivers who signed the Release.  [Dkt. 284 at 59–60].  Plaintiffs point to N.J.

Stat. Ann. § 34:11-4.8, which states:

> a. In case of a dispute over the amount of wages, the employer shall
> pay, without condition and within the time set by this act, all
> wages, or parts thereof, conceded by him to be due, leaving to the
> employee all remedies to which he might otherwise be entitled,
> including those provided under this act, as to any balance claimed.

> b. The acceptance by an employee of a payment under this section shall not constitute a release as to the balance of his claim and any release required by an employer as a condition to payment shall be in violation of this act and shall be null and void.

Plaintiffs argue that the Releases at issue here are "exactly the kind of releases that that N.J. Stat. 34:11-4.8(b) is intended to invalidate." [Dkt. 284 at 60].

NFI offers three responses. First, that § 34:11-4.8 does not apply here because there is no evidence of a dispute over the "amount of wages due" between NFI and these twenty Plaintiffs. [Dkt. 278 at 55]. There is no dispute that these Plaintiffs signed the Release before the Court certified the Plaintiff class, before these Plaintiffs received notice that they were eligible to be class members, and before these Plaintiffs declined to opt out of the class. [*See* Dkt. 170]. Thus, when these Plaintiffs signed the Release, they were not yet members of the class. Plaintiffs have not provided any evidence that the twenty Plaintiffs at issue here otherwise "disputed" their wages with NFI when they signed the Release. [Dkt. 278 at 55]. Second, that NFI never "conceded" that NFI owed wages to these absent class members, and that the Release included a disclaimer of liability. [*Id.* at 56]. Third, that the $6,000 that NFI paid to Plaintiffs were not "wages" subject to dispute, but were funds provided in exchange for a general release. [*Id.*].

Based on the plain language of § 34:11-4.8(b), the Court agrees with NFI.[26] Section 34:11-4.8 contemplates ongoing "disputes" over wages, not "putative disputes," "possible disputes," or "eventual disputes." So when § 34:11-4.8(b) refers to "payment under this

---

[26] Because Plaintiffs only challenge the Release on statutory grounds, the Court need not analyze the Releases under the contract interpretation principles that generally govern releases. *See Nye v. Ingersoll Rand Co.*, 783 F. Supp. 2d 751, 762 (D.N.J. 2011) ("Releases are treated as contracts, for 'a release is merely a form of contract and the general rules that apply to contract interpretation apply to releases.'" (quoting *Domanske v. Rapid–American Corp.*, 49 A.2d 399 (N.J. Super. Ct. App. Div. 2000))).

section," it does not refer broadly to any transfer of value from an employer to an employee for any purpose.  Rather, it refers to payment of "wages … conceded by [the employer] to be due" to the employee in the context of a "dispute over the amount of wages."  Likewise, when § 34:11-4.8(b) refers to "release[s] required by an employer as a condition of payment," it refers only to payments made in the context of an ongoing dispute.  Because § 34:11-4.8(b) speaks of ongoing disputes, it does not prevent an employer from providing consideration in exchange for a general release from liability, even if that release eventually prevents a "dispute over wages."[27]

 Under this reading of § 34:11-4.8, the statute does not invalidate the Releases here.  There was no "dispute over wages" between NFI and the twenty Plaintiffs when they signed the Release because they were not yet class members and Plaintiffs have not provided any other evidence of such a dispute.  Likewise, the $6,000 paid to each Plaintiff was consideration for a general release, and there is no evidence to suggest that this consideration was a concession as to "disputed wages" owed.  Section 34:11-4.8(b) therefore does not render the Releases invalid.  The Court will grant NFI's motion for summary judgment as to the twenty Plaintiffs who signed the Release.[28]

---

[27] Plaintiffs cite *Maldonado v. Lucca*, where the court found that "[o]ffering wages not in dispute in exchange for a waiver of other claims also violates the New Jersey Wage and Hour Law, N.J.S.A. 34:11–4.8."  636 F. Supp. 621, 624 (D.N.J. 1986).  The Court respectfully disagrees, as the Court does not see how a statute that contemplates disputed wages applies to "wages not in dispute."

[28] To the extent that Plaintiffs argue that the Court should exercise its discretion under Rule 23 to strike the Releases as improperly procured through *ex parte* communications, [*see* Dkt. 284 at 60], the Court rejects this argument.  NFI remedied any potential improprieties by sending a curative notice, drafted by Plaintiffs' counsel, specifically informing these twenty Plaintiffs that executing the Release could affect their rights to recover in this case.  Thus, the Plaintiffs who signed the Release were advised that they might not be able to recover in this case.

### d.  WPL Violations and Exceptions

Even if Plaintiffs were NFI employees, NFI contends that it did not violate the WPL because the WPL authorizes the deductions which Plaintiffs allege to be unlawful.  [Dkt. 278 at 52–53].  To support this argument, NFI cites exceptions to the WPL's rule that "no employer may withhold or divert any portion of an employee's wages."  N.J. Stat Ann. § 34:11-4.4.  The Court will discuss each exception separately below.

Plaintiffs argue that it is premature to address these legal issues that concern "damages" at the summary judgment stage, particularly where Plaintiffs only seek a ruling that they were employees under the ABC test.  [Dkt. 284 at 54–55].  Plaintiffs also state that these are fact-intensive issues that the "Court cannot decide when it has no record of deductions before it."  [*Id.* at 55].  But Plaintiffs do not argue that NFI did not deduct funds from Plaintiffs' pay or raise a factual dispute as to whether NFI deducted funds from Plaintiffs.  The Court will therefore determine whether it is appropriate to consider NFI's arguments on a case-by-case basis based on the evidence that the parties have provided to date.

### i.  Insurance

NFI first argues that the WPL authorized NFI to withhold deductions for insurance which Plaintiffs agree to purchase through NFI.  [Dkt. 278 at 52].  This included insurance for "liability and cargo, occupational accident or workers' compensation, bobtail, or physical damage."  [*Id.* at 52].  NFI points to N.J. Stat Ann. § 34:11-4.4(b)(1) which states that employers may withhold wages diverted for

> [c]ontributions authorized either in writing by employees, or under a collective bargaining agreement, to **employee** welfare, **insurance**, hospitalization, medical or surgical or both, pension, retirement, and profit-sharing **plans**, and to plans establishing individual retirement annuities on a group or individual basis, … or individual retirement accounts at any State or federally

46

> chartered bank, savings bank, or savings and loan association …
> for the employee, his spouse or both.

N.J. Stat Ann. § 34:11-4.4(b)(1) (emphasis added).  NFI insists that the "insurance" term in §

34:11-4.4(b)(1) permitted NFI to deduct money for insurance payments which Plaintiffs agreed

to purchase through NFI.  [Dkt. 278 at 52–53].  Plaintiffs point to the language bolded above to

argue that this provision contemplates "group plans for employees like health insurance or life

insurance plans," which do not cover truck damage, trailer damage, and other liabilities that may

have arisen while working.  [Dkt. 284 at 56].

This dispute requires the Court to interpret § 34:11-4.4(b)(1) to determine which types of

insurance this statute covers.  When interpreting a statute, courts must examine the statute's plain

language to determine legislative intent.  *MRL Dev. I, LLC v. Whitecap Inv. Corp.*, 823 F.3d 195,

204–05 (3d Cir. 2016).  "[W]ords are to be given the meaning that proper grammar and usage

would assign them," and "the rules of grammar govern statutory interpretation unless they

contradict legislative intent or purpose."  *Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) (citations

and quotations omitted).  Courts must also treat adjacent terms alike "to avoid ascribing to one

word a meaning so broad that it is inconsistent with its accompanying words, thus giving

unintended breadth to [statutory language]."  *Yates v. United States*, 574 U.S. 528, 543 (2015).

The Court must determine whether § 34:11-4.4(b)(1) applies to all forms of insurance

without qualification, or applies only to "group plans for employees" as Plaintiffs suggest.

Based on this provision's grammatical structure, the Court understands the term "insurance" to

be modified by the term "employee," and to modify the term "plan."  In the Court's view, the

term "employee" as bolded above modifies the terms in the clause that follow it (up to the word

"plan" and including the term "insurance") because the benefits described in that clause are

benefits that accrue to employees, such as "pensions."  This interpretation is also consistent with

the final clause in the statute, which contemplates retirement accounts "for employees."  With respect to the term "**plan**" as bolded above, nearly all of the terms that precede this term are nouns that could seemingly stand alone.  But in the middle of this list are the adjectives "medical or surgical" which cannot stand alone and which must modify a noun.  The most logical term for "medical or surgical" to modify is "plans" because it is the last term in that clause, and the next clause discusses another list of "plans."  Because the statute lists "insurance" alongside the terms "medical or surgical," the Court understands "insurance" to modify "plans."  *See Morales*, 2019 WL 2932649, at *8 (interpreting "insurance" in § 34:11-4.4(b)(1) to mean "employee insurance plans").

Next, the Court must determine the kinds of insurance that qualify as "employee insurance plans."  To do so, the Court takes its cue from the statute's "adjacent terms."  *Yates*, 574 U.S. at 543.  The other terms in this provision contemplate hazards ("medical or surgical," "hospitalization") and benefits ("pension, retirement, or profit sharing") that apply to employees in their lives outside of work, rather than commercial hazards that occur during work and that that do not pertain to an employee's health or finances.  Thus, to find that the term applies to all types of "insurance" would be "inconsistent with its accompanying words, thus giving unintended breadth to [statutory language]."  *Yates*, 574 U.S. at 543.  *See also Morales*, 2019 WL 2932649, at *8 (finding that employer was not entitled to summary judgment under § 34:11-4.4(b)(1) for deductions for "occupational accident insurance" and "workers' compensation insurance" because there was no evidence that these deductions were for "employee insurance plans).

Applying this interpretation of "insurance," the Court will deny NFI's motion for summary judgment on this issue because NFI has not produced sufficient evidence to show that

the payments that NFI held were for "insurance" under § 34:11-4.4(b)(1) as defined above.
While the ICOAs required Plaintiffs to purchase certain types of insurance and list types of
insurance that Plaintiffs could purchase through NFI, it is unclear to the Court which forms of
insurance Plaintiffs actually purchased through NFI, and whether this insurance qualifies under §
34:11-4.4(b)(1).  And while some testimonial evidence suggests that Defendants opted to
purchase insurance through NFI, [*e.g.* Dkt. 280-7, 7/8/2019 Castaneda Dep. 150:25–152:10], the
testimony speaks of "insurance" broadly without specifying the types of insurance purchased.
NFI has not produced insurance policies themselves, so the Court cannot examine the text of any
such policy to determine whether the insurance qualifies under § 34:11-4.4(b)(1).  Summary
judgment in favor of NFI is therefore inappropriate at this juncture.

### ii.  Communication and Tracking Devices

NFI argues that the deductions authorized in the ICOAs for the communication and
tracking equipment which the ICOAs also required Plaintiffs to install in their trucks meets
another statutory exception.  [Dkt. 278 at 54].  NFI points to § 34:11-4.4(b)(4) which permits
employers to withhold funds for "[p]ayments for company products purchased in accordance
with a periodic payment schedule contained in the original purchase agreement."  NFI contends
that the communication system is a "company product" that NFI provided to Plaintiffs and that
the ICOAs set forth a "payment schedule."  [Dkt. 278 at 54].

The Court disagrees for two reasons.  First, there is no evidence that Plaintiffs
"purchased" the communications equipment from NFI.  The 2010 and 2017 ICOAs permitted
Plaintiffs to rent the equipment from NFI or to purchase the equipment separately, [Dkt. 145-5 at
6, 2010 ICOA ¶ 8(g); Dkt. 190-15, 2017 ICOA ¶ 8(g)], and the 2009 ICOA required Plaintiffs to
rent the equipment from NFI.  [Dkt. 145-11 at 9, 2009 ICOA Exh. A at 2].  But under each of

these ICOAs, Plaintiffs rented rather than purchased the equipment from NFI.  *See Servenen v.*

*EmpireCLS Worldwide Chauffeured Servs.*, No. CIV.A. 10-3743 JLL, 2010 WL 5392873, at *3

(D.N.J. Dec. 22, 2010) (finding that § 34:11-4.4(b)(4) did not apply to leased equipment and

denying motion to dismiss the plaintiff's WPL claim).  NFI has not identified any record

evidence to show that Plaintiffs purchased—and did not rent—this equipment from NFI.

Second, the communication and tracking devices are not "company products."  The plain

meaning of "company product" suggests that it is a good or service that a company makes or

sells in the usual course of its business.  "Product" means "something produced" or a good or

service "marketed or sold as a commodity."  *Product*, Merriam-Webster, https://www.merriam-

webster.com/dictionary/product.  When modified by the word "company," "product" here means

"something produced" by the "company" or something "marketed or sold as a commodity" by

the "company."  There is no record evidence to suggest that NFI "produced" the tracking and

communications equipment or "marketed and sold" this equipment "as a commodity."  The

Court therefore denies NFI's motion for summary judgment on this issue.

### iii.  Fuel "Loans"

Finally, NFI argues that its practice of deducting fuel costs from Plaintiffs' pay if

Plaintiffs purchased fuel from NFI's on-site gas pump or used an NFI-issued fuel credit card is

permissible under N.J. Stat. Ann. § 34:11-4.4(b)(4).  Section 34:11-4.4(b)(4) permits employers

to deduct "payments for employer loans to employees, in accordance with a periodic payment

schedule contained in the original loan agreement."  According to NFI, NFI "loaned" the cost of

fuel to Plaintiffs when Plaintiffs used NFI's onsite pumps or fuel credit cards to purchase fuel,

and the ICOAs were "loan agreements" because they indicate that NFI would deduct fuel costs

from Plaintiffs' pay.  [Dkt. 278 at 53].

The Court disagrees.  The ICOAs do not indicate that the parties understood or intended the ICOAs—which purported to broadly define the working relationship between Plaintiffs and NFI—to be formal "loan agreements."  Indeed, the word "loan" does not appear anywhere in the ICOAs.  Finding that the ICOAs were "loan agreements" despite any formal indication that the parties understood the ICOAs to be loan agreements," and even if the ICOAs functioned as "loan agreements," would stretch § 34:11-4.4(b)(4) too far.  Such a reading would, for example, permit a finding that the withholdings for insurance and communications equipment discussed above were "loans" because these withholdings were structured in the same manner as the fuel withholdings.  The Court will not ascribe such an expansive interpretation to § 34:11-4.4(b)(4), one of only eleven narrowly defined exceptions to the WPL.  *Yates*, 574 U.S. at 543 (observing that courts should avoid adding "unintended breadth to [statutory language].").  The Court will therefore deny NFI's motion on this issue.

### iv.   Comment on the Scope of these Rulings Concerning § 34:11-4.4 Withholdings

The Court must clarify the scope of its decision to deny NFI's motion for summary judgment with respect to the applicability of § 34:11-4.4's exclusions.  The Court is not ruling NFI must absorb the costs of insurance, communications equipment, fuel, or any other cost because NFI is an "employer" under the ABC test.  Relatedly, the Court does not rule that these costs were losses that Plaintiffs suffered and that Plaintiffs are entitled to recover as damages. These are still open questions that the Court will answer when the parties have fully briefed them for the Court's consideration.  The Court only rules that NFI cannot prevail on these issues at this juncture.

**IV.     CONCLUSION**

For the reasons discussed above, the Court will grant Plaintiffs' motion for summary judgment on the issue of whether Plaintiffs were employees under New Jersey's ABC test, and deny NFI's cross-motion for summary judgment on the same issue.  The Court will also deny NFI's motion for summary judgment based on TIL preemption, and on the issue of whether certain withholdings were lawful under § 34:11-4.4.  Finally, the Court will grant NFI's motion for summary judgment as to the twenty Plaintiffs who signed the Release.  An appropriate order will follow.


June 9, 2022                                                    ___/s/ Hon. Joseph H. Rodriguez___

                                                               Hon. Joseph H. Rodriguez, USDJ